(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ARIZONA STATE LEGISLATURE *v.* ARIZONA INDEPENDENT REDISTRICTING COMMISSION ET AL.

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

No. 13–1314.   Argued March 2, 2015—Decided June 29, 2015

Under Arizona's Constitution, the electorate shares lawmaking authority on equal footing with the Arizona Legislature. The voters may adopt laws and constitutional amendments by ballot initiative, and they may approve or disapprove, by referendum, measures passed by the Legislature. Ariz. Const., Art. IV, pt. 1, §1. "Any law which may be enacted by the Legislature . . . may be enacted by the people under the Initiative." Art. XXII, §14.

In 2000, Arizona voters adopted Proposition 106, an initiative aimed at the problem of gerrymandering. Proposition 106 amended Arizona's Constitution, removing redistricting authority from the Arizona Legislature and vesting it in an independent commission, the Arizona Independent Redistricting Commission (AIRC). After the 2010 census, as after the 2000 census, the AIRC adopted redistricting maps for congressional as well as state legislative districts. The Arizona Legislature challenged the map the Commission adopted in 2012 for congressional districts, arguing that the AIRC and its map violated the "Elections Clause" of the U. S. Constitution, which provides: "The Times, Places and Manner of holding Elections for Senators and Representatives shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." Because "Legislature" means the State's representative assembly, the Arizona Legislature contended, the Clause precludes resort to an independent commission, created by initiative, to accomplish redistricting. A three-judge District Court held that the Arizona Legislature had standing to sue, but rejected its complaint on the merits.

*Held*:

1. The Arizona Legislature has standing to bring this suit. In claiming that Proposition 106 stripped it of its alleged constitutional prerogative to engage in redistricting and that its injury would be remedied by a court order enjoining the proposition's enforcement, the Legislature has shown injury that is 'concrete and particularized' and 'actual or imminent,'" *Arizonans for Official English* v. *Arizona,* 520 U. S. 43, 64, "fairly traceable to the challenged action," and "redressable by a favorable ruling," *Clapper* v. *Amnesty Int'l USA*, 568 U. S. ___, ___. Specifically, Proposition 106, together with the Arizona Constitution's ban on efforts by the Arizona Legislature to undermine the purposes of an initiative, would "completely nullif[y]" any vote by the Legislature, now or "in the future," purporting to adopt a redistricting plan. *Raines* v. *Byrd*, 521 U. S. 811, 823–824. Pp. 9–15.

2. The Elections Clause and 2 U. S. C. §2a(c) permit Arizona's use of a commission to adopt congressional districts. Pp. 15–35.

(a) Redistricting is a legislative function to be performed in accordance with the State's prescriptions for lawmaking, which may include the referendum, *Ohio ex rel. Davis* v. *Hildebrant*, 241 U. S. 565, 567, and the Governor's veto, *Smiley* v. *Holm*, 285 U. S. 355, 369. While exercise of the initiative was not at issue in this Court's prior decisions, there is no constitutional barrier to a State's empowerment of its people by embracing that form of lawmaking. Pp. 15–19.

(b) Title 2 U. S. C. §2a(c)—which provides that, "[u]ntil a State is redistricted in the manner provided by the law thereof after any apportionment," it must follow federally prescribed redistricting procedures—permits redistricting in accord with Arizona's initiative. From 1862 through 1901, apportionment Acts required a State to follow federal procedures unless "the [state] legislature" drew district lines. In 1911, Congress, recognizing that States had supplemented the representative legislature mode of lawmaking with a direct lawmaking role for the people, replaced the reference to redistricting by the state "legislature" with a reference to redistricting of a State "in the manner provided by the laws thereof." §4, 37 Stat. 14. The Act's legislative history "leaves no . . . doubt," *Hildebrant*, 241 U. S., at 568, that the change was made to safeguard to "each state full authority to employ in the creation of congressional districts its own laws and regulations." 47 Cong. Rec. 3437. "If they include the initiative, it is included." *Id.,* at 3508. Congress used virtually identical language in enacting §2a(c) in 1941. This provision also accords full respect to the redistricting procedures adopted by the States. Thus, so long as a State has "redistricted in the manner provided by the law thereof"—as Arizona did by utilizing the independent commission procedure in its Constitution—the resulting redistricting plan becomes the presumptively governing map.

Syllabus

Though four of §2a(c)'s five default redistricting procedures—operative only when a State is not "redistricted in the manner provided by [state] law"—have become obsolete as a result of this Court's decisions embracing the one-person, one-vote principle, this infirmity does not bear on the question whether a State has been "redistricted in the manner provided by [state] law." Pp. 19–23.

(c) The Elections Clause permits the people of Arizona to provide for redistricting by independent commission. The history and purpose of the Clause weigh heavily against precluding the people of Arizona from creating a commission operating independently of the state legislature to establish congressional districts. Such preclusion would also run up against the Constitution's animating principle that the people themselves are the originating source of all the powers of government. Pp. 24–35.

(1) The dominant purpose of the Elections Clause, the historical record bears out, was to empower Congress to override state election rules, not to restrict the way States enact legislation. See *Inter Tribal Council of Ariz.,* 570 U. S., at ___. Ratification arguments in support of congressional oversight focused on potential abuses by state politicians, but the legislative processes by which the States could exercise their initiating role in regulating congressional elections occasioned no debate. Pp. 25–27.

(2) There is no suggestion that the Election Clause, by specifying "the Legislature thereof," required assignment of congressional redistricting authority to the State's representative body. It is characteristic of the federal system that States retain autonomy to establish their own governmental processes free from incursion by the Federal Government. See, *e.g., Alden* v. *Maine*, 527 U. S. 706, 752. "Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign." *Gregory* v. *Ashcroft*, 501 U. S. 452, 460. Arizona engaged in definition of that kind when its people placed both the initiative power and the AIRC's redistricting authority in the portion of the Arizona Constitution delineating the State's legislative authority, Ariz. Const., Art. IV. The Elections Clause should not be read to single out federal elections as the one area in which States may not use citizen initiatives as an alternative legislative process. And reading the Clause to permit the use of the initiative to control state and local elections but not federal elections would "deprive several States of the convenience of having the elections for their own governments and for the national government" held at the same times and places, and in the same manner. The Federalist No. 61, p. 374 (Hamilton). Pp. 27–30.

(3) The Framers may not have imagined the modern initiative

process in which the people's legislative power is coextensive with the state legislature's authority, but the invention of the initiative was in full harmony with the Constitution's conception of the people as the font of governmental power. It would thus be perverse to interpret "Legislature" in the Elections Clause to exclude lawmaking by the people, particularly when such lawmaking is intended to advance the prospect that Members of Congress will in fact be "chosen . . . by the People of the several States," Art. I, §2. Pp. 30–33.

(4) Banning lawmaking by initiative to direct a State's method of apportioning congressional districts would not just stymie attempts to curb gerrymandering. It would also cast doubt on numerous other time, place, and manner regulations governing federal elections that States have adopted by the initiative method. As well, it could endanger election provisions in state constitutions adopted by conventions and ratified by voters at the ballot box, without involvement or approval by "the Legislature." Pp. 33–35.

997 F. Supp. 2d 1047, affirmed.

GINSBURG, J., delivered the opinion of the Court, in which KENNEDY, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. ROBERTS, C. J., filed a dissenting opinion, in which SCALIA, THOMAS, and ALITO, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 13–1314

———————

## ARIZONA STATE LEGISLATURE, APPELLANT *v.* ARIZONA INDEPENDENT REDISTRICTING COMMISSION ET AL.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

[June 29, 2015]

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns an endeavor by Arizona voters to address the problem of partisan gerrymandering—the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power.[1] "[P]artisan gerrymanders," this Court has recognized, "[are incompatible] with democratic principles." *Vieth* v. *Jubelirer*, 541 U. S. 267, 292 (2004) (plurality opinion); *id.*, at 316 (KENNEDY, J., concurring in judgment). Even so, the Court in *Vieth* did not grant relief on the plaintiffs' partisan gerrymander claim. The plurality held the matter nonjusticiable. *Id.*, at 281. JUSTICE KENNEDY found no standard workable in that case, but left open the possibility that a suitable standard might be identified in later litigation. *Id.*, at 317.

———————

[1] The term "gerrymander" is a portmanteau of the last name of Elbridge Gerry, the eighth Governor of Massachusetts, and the shape of the electoral map he famously contorted for partisan gain, which included one district shaped like a salamander. See E. Griffith, The Rise and Development of the Gerrymander 16–19 (Arno ed. 1974).

In 2000, Arizona voters adopted an initiative, Proposition 106, aimed at "ending the practice of gerrymandering and improving voter and candidate participation in elections." App. 50. Proposition 106 amended Arizona's Constitution to remove redistricting authority from the Arizona Legislature and vest that authority in an independent commission, the Arizona Independent Redistricting Commission (AIRC or Commission). After the 2010 census, as after the 2000 census, the AIRC adopted redistricting maps for congressional as well as state legislative districts.

The Arizona Legislature challenged the map the Commission adopted in January 2012 for congressional districts. Recognizing that the voters could control redistricting for state legislators, Brief for Appellant 42, 47; Tr. of Oral Arg. 3–4, the Arizona Legislature sued the AIRC in federal court seeking a declaration that the Commission and its map for congressional districts violated the "Elections Clause" of the U. S. Constitution. That Clause, critical to the resolution of this case, provides:

> "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . ." Art. I, §4, cl. 1.

The Arizona Legislature's complaint alleged that "[t]he word 'Legislature' in the Elections Clause means [specifically and only] the representative body which makes the laws of the people," App. 21, ¶37; so read, the Legislature urges, the Clause precludes resort to an independent commission, created by initiative, to accomplish redistricting. The AIRC responded that, for Elections Clause purposes, "the Legislature" is not confined to the elected representatives; rather, the term encompasses all legislative authority conferred by the State Constitution, includ-

ing initiatives adopted by the people themselves.

A three-judge District Court held, unanimously, that the Arizona Legislature had standing to sue; dividing two to one, the Court rejected the Legislature's complaint on the merits. We postponed jurisdiction and instructed the parties to address two questions: (1) Does the Arizona Legislature have standing to bring this suit? (2) Do the Elections Clause of the United States Constitution and 2 U. S. C. §2a(c) permit Arizona's use of a commission to adopt congressional districts? 573 U. S. \_\_\_ (2014).

We now affirm the District Court's judgment. We hold, first, that the Arizona Legislature, having lost authority to draw congressional districts, has standing to contest the constitutionality of Proposition 106. Next, we hold that lawmaking power in Arizona includes the initiative process, and that both §2a(c) and the Elections Clause permit use of the AIRC in congressional districting in the same way the Commission is used in districting for Arizona's own Legislature.

I

A

Direct lawmaking by the people was "virtually unknown when the Constitution of 1787 was drafted." Donovan & Bowler, An Overview of Direct Democracy in the American States, in Citizens as Legislators 1 (S. Bowler, T. Donovan, & C. Tolbert eds. 1998). There were obvious precursors or analogues to the direct lawmaking operative today in several States, notably, New England's town hall meetings and the submission of early state constitutions to the people for ratification. See Lowell, The Referendum in the United States, in The Initiative, Referendum and Recall 126, 127 (W. Munro ed. 1912) (hereinafter IRR); W. Dodd, The Revision and Amendment of State Constitu-

tions 64–67 (1910).[2]  But it was not until the turn of the 20th century, as part of the Progressive agenda of the era, that direct lawmaking by the electorate gained a foothold, largely in Western States.  See generally Persily, The Peculiar Geography of Direct Democracy: Why the Initiative, Referendum and Recall Developed in the American West, 2 Mich L. & Pol'y Rev. 11 (1997).

The two main "agencies of direct legislation" are the initiative and the referendum.  Munro, Introductory, in IRR 8.  The initiative operates entirely outside the States' representative assemblies; it allows "voters [to] petition to propose statutes or constitutional amendments to be adopted or rejected by the voters at the polls."  D. Magleby, Direct Legislation 1 (1984).  While the initiative allows the electorate to adopt positive legislation, the referendum serves as a negative check.  It allows "voters [to] petition to refer a legislative action to the voters [for approval or disapproval] at the polls."  *Ibid.*  "The initiative [thus] corrects sins of omission" by representative bodies, while the "referendum corrects sins of commission."  Johnson, Direct Legislation as an Ally of Representative Government, in IRR 139, 142.

In 1898, South Dakota took the pathmarking step of affirming in its Constitution the people's power "directly [to] control the making of all ordinary laws" by initiative and referendum. Introductory, *id.,* at 9.  In 1902, Oregon became the first State to adopt the initiative as a means,

---

[2] The Massachusetts Constitution of 1780 is illustrative of the understanding that the people's authority could trump the state legislature's.  Framed by a separate convention, it was submitted to the people for ratification.  That occurred after the legislature attempted to promulgate a Constitution it had written, an endeavor that drew opposition from many Massachusetts towns.  See J. Rakove, Original Meanings: Politics and Ideas in the Making of the Constitution 96–101 (1996); G. Wood, The Creation of the American Republic, 1776–1787, pp. 339–341 (1969).

not only to enact ordinary laws, but also to amend the State's Constitution. J. Dinan, The American State Constitutional Tradition 62 (2006). By 1920, the people in 19 States had reserved for themselves the power to initiate ordinary lawmaking, and, in 13 States, the power to initiate amendments to the State's Constitution. *Id.,* at 62, and n. 132, 94, and n. 151. Those numbers increased to 21 and 18, respectively, by the close of the 20th century. *Ibid.*[3]

### B

For the delegates to Arizona's constitutional convention, direct lawmaking was a "principal issu[e]." J. Leshy, The Arizona State Constitution 8–9 (2d ed. 2013) (hereinafter Leshy). By a margin of more than three to one, the people of Arizona ratified the State's Constitution, which included, among lawmaking means, initiative and referendum provisions. *Id.,* at 14–16, 22. In the runup to Arizona's admission to the Union in 1912, those provisions generated no controversy. *Id.,* at 22.

In particular, the Arizona Constitution "establishes the electorate [of Arizona] as a coordinate source of legislation" on equal footing with the representative legislative body. *Queen Creek Land & Cattle Corp.* v. *Yavapai Cty. Bd. of Supervisors*, 108 Ariz. 449, 451, 501 P. 2d 391, 393 (1972); *Cave Creek Unified School Dist.* v. *Ducey*, 233 Ariz. 1, 4, 308 P. 3d 1152, 1155 (2013) ("The legislature and

———————

[3] The people's sovereign right to incorporate themselves into a State's lawmaking apparatus, by reserving for themselves the power to adopt laws and to veto measures passed by elected representatives, is one this Court has ranked a nonjusticiable political matter. *Pacific States Telephone & Telegraph Co.* v. *Oregon*, 223 U. S. 118 (1912) (rejecting challenge to referendum mounted under Article IV, §4's undertaking by the United States to "guarantee to every State in th[e] Union a Republican Form of Government"). But see *New York* v. *United States*, 505 U. S. 144, 185 (1992) ("[P]erhaps not all claims under the Guarantee Clause present nonjusticiable political questions.").

electorate share lawmaking power under Arizona's system
of government." (internal quotation marks omitted)). The
initiative, housed under the article of the Arizona Consti-
tution concerning the "Legislative Department" and the
section defining the State's "legislative authority," re-
serves for the people "the power to propose laws and
amendments to the constitution." Art. IV, pt. 1, §1. The
Arizona Constitution further states that "[a]ny law which
may be enacted by the Legislature under this Constitution
may be enacted by the people under the Initiative."
Art. XXII, §14. Accordingly, "[g]eneral references to the
power of the 'legislature'" in the Arizona Constitution
"include the people's right (specified in Article IV, part 1)
to bypass their elected representatives and make laws
directly through the initiative." Leshy xxii.

C

Proposition 106, vesting redistricting authority in the
AIRC, was adopted by citizen initiative in 2000 against a
"background of recurring redistricting turmoil" in Arizona.
Cain, Redistricting Commissions: A Better Political Buf-
fer? 121 Yale L. J. 1808, 1831 (2012). Redistricting plans
adopted by the Arizona Legislature sparked controversy in
every redistricting cycle since the 1970's, and several of
those plans were rejected by a federal court or refused
preclearance by the Department of Justice under the
Voting Rights Act of 1965. See *id.,* at 1830–1832.[4]

————————

[4] From Arizona's admission to the Union in 1912 to 1940, no congres-
sional districting occurred because Arizona had only one Member of
Congress. K. Martis, The Historical Atlas of United States Congres-
sional Districts, 1789–1983, p. 3 (1982) (Table 1). Court-ordered
congressional districting plans were in place from 1966 to 1970, and
from 1982 through 2000. See *Klahr* v. *Williams*, 313 F. Supp. 148
(Ariz. 1970); *Goddard* v. *Babbitt*, 536 F. Supp. 538 (Ariz. 1982); *Arizo-
nans for Fair Representation* v. *Symington*, 828 F. Supp. 684 (Ariz.
1992); Norrander & Wendland, Redistricting in Arizona, in Reappor-
tionment and Redistricting in the West 177, 178–179 (G. Moncrief ed.

Aimed at "ending the practice of gerrymandering and improving voter and candidate participation in elections," App. 50, Proposition 106 amended the Arizona Constitution to remove congressional redistricting authority from the state legislature, lodging that authority, instead, in a new entity, the AIRC. Ariz. Const., Art. IV, pt. 2, §1, ¶¶3–23. The AIRC convenes after each census, establishes final district boundaries, and certifies the new districts to the Arizona Secretary of State. ¶¶16–17. The legislature may submit nonbinding recommendations to the AIRC, ¶16, and is required to make necessary appropriations for its operation, ¶18. The highest ranking officer and minority leader of each chamber of the legislature each select one member of the AIRC from a list compiled by Arizona's Commission on Appellate Court Appointments. ¶¶4–7. The four appointed members of the AIRC then choose, from the same list, the fifth member, who chairs the Commission. ¶8. A Commission's tenure is confined to one redistricting cycle; each member's time in office "expire[s] upon the appointment of the first member of the next redistricting commission." ¶23.

Holders of, or candidates for, public office may not serve on the AIRC, except candidates for or members of a school board. ¶3. No more than two members of the Commission may be members of the same political party, *ibid.*, and the presiding fifth member cannot be registered with any party already represented on the Commission, ¶8. Subject to the concurrence of two-thirds of the Arizona Senate, AIRC members may be removed by the Arizona Governor for gross misconduct, substantial neglect of duty, or inability to discharge the duties of office. ¶10.[5]

––––––––––

2011).

   [5] In the current climate of heightened partisanship, the AIRC has encountered interference with its operations. In particular, its dependence on the Arizona Legislature for funding, and the removal provision have proved problematic. In 2011, when the AIRC proposed boundaries

Several other States, as a means to curtail partisan gerrymandering, have also provided for the participation of commissions in redistricting. Some States, in common with Arizona, have given nonpartisan or bipartisan commissions binding authority over redistricting.[6] The California Redistricting Commission, established by popular initiative, develops redistricting plans which can be halted by public referendum.[7] Still other States have given commissions an auxiliary role, advising the legislatures on redistricting,[8] or serving as a "backup" in the event the State's representative body fails to complete redistricting.[9] Studies report that nonpartisan and bipartisan commissions generally draw their maps in a timely fashion and create districts both more competitive and more likely to survive legal challenge. See Miller & Grofman, Redistricting Commissions in the Western United States, 3 U. C. Irvine L. Rev. 637, 661, 663–664, 666 (2013).

D

On January 17, 2012, the AIRC approved final congressional and state legislative maps based on the 2010 census. See Arizona Independent Redistricting, Final Maps,

—————

the majority party did not like, the Governor of Arizona attempted to remove the Commission's independent chair. Her attempt was stopped by the Arizona Supreme Court. See Cain, Redistricting Commissions: A Better Political Buffer? 121 Yale L. J. 1808, 1835–1836 (2012) (citing *Mathis* v. *Brewer*, No. CV–11–0313–SA (Ariz. 2011)); *Arizona Independent Redistricting Comm'n* v. *Brewer*, 229 Ariz. 347, 275 P. 3d 1267 (2012).

[6] See Haw. Const., Art. IV, §2, and Haw. Rev. Stat. §§25–1 to 25–9 (2009 and 2013 Cum. Supp.); Idaho Const., Art. III, §2; Mont. Const., Art. V, §14; N. J. Const., Art. II, §2; Wash Const., Art. II, §43.

[7] See Cal. Const., Art. XXI, §2; Cal. Govt. Code Ann. §§8251–8253.6 (West Supp. 2015).

[8] See Iowa Code §§42.1–42.6 (2013); Ohio Rev. Code Ann. §103.51 (Lexis 2014); Me. Const., Art. IV, pt. 3, §1–A.

[9] See Conn. Const., Art. III, §6; Ind. Code §3–3–2–2 (2014).

http://azredistricting.org/Maps/Final-Maps/default.asp (all
Internet materials as visited June 25, 2015, and included
in Clerk of Court's case file). Less than four months later,
on June 6, 2012, the Arizona Legislature filed suit in the
United States District Court for the District of Arizona,
naming as defendants the AIRC, its five members, and the
Arizona Secretary of State. The Legislature sought both a
declaration that Proposition 106 and congressional maps
adopted by the AIRC are unconstitutional, and, as affirm-
ative relief, an injunction against use of AIRC maps for
any congressional election after the 2012 general election.

A three-judge District Court, convened pursuant to 28
U. S. C. §2284(a), unanimously denied a motion by the
AIRC to dismiss the suit for lack of standing. The Arizona
Legislature, the court determined, had "demonstrated that
its loss of redistricting power constitute[d] a [sufficiently]
concrete injury." 997 F. Supp. 2d 1047, 1050 (2014). On
the merits, dividing two to one, the District Court granted
the AIRC's motion to dismiss the complaint for failure to
state a claim. Decisions of this Court, the majority con-
cluded, "demonstrate that the word 'Legislature' in the
Elections Clause refers to the legislative process used in
[a] state, determined by that state's own constitution and
laws." *Id.*, at 1054. As the "lawmaking power" in Arizona
"plainly includes the power to enact laws through initia-
tive," the District Court held, the "Elections Clause per-
mits [Arizona's] establishment and use" of the Commis-
sion. *Id.*, at 1056. Judge Rosenblatt dissented in part.
Proposition 106, in his view, unconstitutionally denied
"the Legislature" of Arizona the "ability to have any out-
come-defining effect on the congressional redistricting
process." *Id.,* at 1058.

We postponed jurisdiction, and now affirm.

## II

We turn first to the threshold question: Does the Ari-

zona Legislature have standing to bring this suit? Trained
on "whether the plaintiff is [a] proper party to bring [a
particular lawsuit,]" standing is "[o]ne element" of the
Constitution's case-or-controversy limitation on federal
judicial authority, expressed in Article III of the Constitu-
tion. *Raines* v. *Byrd*, 521 U. S. 811, 818 (1997). "To qual-
ify as a party with standing to litigate," the Arizona Legis-
lature "must show, first and foremost," injury in the form
of "'invasion of a legally protected interest' that is 'con-
crete and particularized' and 'actual or imminent.'" *Ari-
zonans for Official English* v. *Arizona*, 520 U. S. 43, 64
(1997) (quoting *Lujan* v. *Defenders of Wildlife*, 504 U. S.
555, 560 (1992)). The Legislature's injury also must be
"fairly traceable to the challenged action" and "redressable
by a favorable ruling." *Clapper* v. *Amnesty Int'l USA*, 568
U. S. ___, ___ (2013) (slip op., at 10) (internal quotation
marks omitted).

The Arizona Legislature maintains that the Elections
Clause vests in it "primary responsibility" for redistricting.
Brief for Appellant 51, 53. To exercise that responsibility,
the Legislature urges, it must have at least the opportun-
ity to engage (or decline to engage) in redistricting before
the State may involve other actors in the redistricting
process. See *id.*, at 51–53. Proposition 106, which gives
the AIRC binding authority over redistricting, regardless
of the Legislature's action or inaction, strips the Legisla-
ture of its alleged prerogative to initiate redistricting.
That asserted deprivation would be remedied by a court
order enjoining the enforcement of Proposition 106. Al-
though we conclude that the Arizona Legislature does not
have the exclusive, constitutionally guarded role it asserts,
see *infra*, at 24–35, one must not "confus[e] weakness on
the merits with absence of Article III standing." *Davis* v.
*United States*, 564 U. S. ___, ___, n. 10 (2011) (slip op., at
19, n. 10); see *Warth* v. *Seldin*, 422 U. S. 490, 500 (1975)
(standing "often turns on the nature and source of the

claim asserted," but it "in no way depends on the merits" of the claim).

The AIRC argues that the Legislature's alleged injury is insufficiently concrete to meet the standing requirement absent some "specific legislative act that would have taken effect but for Proposition 106." Brief for Appellees 20. The United States, as *amicus curiae*, urges that even more is needed: the Legislature's injury will remain speculative, the United States contends, unless and until the Arizona Secretary of State refuses to implement a competing redistricting plan passed by the Legislature. Brief for United States 14–17. In our view, the Arizona Legislature's suit is not premature, nor is its alleged injury too "conjectural" or "hypothetical" to establish standing. *Defenders of Wildlife*, 504 U. S., at 560 (internal quotation marks omitted).

Two prescriptions of Arizona's Constitution would render the Legislature's passage of a competing plan and submission of that plan to the Secretary of State unavailing. Indeed, those actions would directly and immediately conflict with the regime Arizona's Constitution establishes. Cf. *Sporhase* v. *Nebraska ex rel. Douglas*, 458 U. S. 941, 944, n. 2 (1982) (failure to apply for permit which "would not have been granted" under existing law did not deprive plaintiffs of standing to challenge permitting regime). First, the Arizona Constitution instructs that the Legislature "shall not have the power to adopt any measure that supersedes [an initiative], in whole or in part, . . . unless the superseding measure furthers the purposes" of the initiative. Art. IV, pt. 1, §1(14). Any redistricting map passed by the Legislature in an effort to supersede the AIRC's map surely would not "furthe[r] the purposes" of Proposition 106. Second, once the AIRC certifies its redistricting plan to the Secretary of State, Arizona's Constitution requires the Secretary to implement that plan and no other. See Art. IV, pt. 2, §1(17); *Arizona Minority Coalition for Fair Redistricting* v. *Arizona Independent Redis-*

*tricting Comm'n*, 211 Ariz. 337, 351, 121 P. 3d 843, 857
(App. 2005) (*per curiam*) ("Once the Commission certifies
[its] maps, the secretary of state must use them in con-
ducting the next election."). To establish standing, the
Legislature need not violate the Arizona Constitution and
show that the Secretary of State would similarly disregard
the State's fundamental instrument of government.

*Raines* v. *Byrd*, 521 U. S. 811 (1997), does not aid
AIRC's argument that there is no standing here. In
*Raines*, this Court held that six *individual Members* of
Congress lacked standing to challenge the Line Item Veto
Act. *Id.,* at 813–814, 829–830 (holding specifically and
only that "individual members of Congress [lack] Article
III standing"). The Act, which gave the President author-
ity to cancel certain spending and tax benefit measures
after signing them into law, allegedly diluted the efficacy
of the Congressmembers' votes. *Id.,* at 815–817. The
"institutional injury" at issue, we reasoned, scarcely ze-
roed in on any individual Member. *Id.,* at 821. "[W]idely
dispersed," the alleged injury "necessarily [impacted] all
Members of Congress and both Houses . . . equally." *Id.,*
at 829, 821. None of the plaintiffs, therefore, could tena-
bly claim a "personal stake" in the suit. *Id.,* at 830.

In concluding that the individual Members lacked
standing, the Court "attach[ed] some importance to the
fact that [the *Raines* plaintiffs had] not been authorized to
represent their respective Houses of Congress." *Id.,* at
829. "[I]ndeed," the Court observed, "both houses actively
oppose[d] their suit." *Ibid.* Having failed to prevail in
their own Houses, the suitors could not repair to the Judi-
ciary to complain. The Arizona Legislature, in contrast, is
an institutional plaintiff asserting an institutional injury,
and it commenced this action after authorizing votes in
both of its chambers, App. 26–27, 46. That "different . . .
circumstanc[e]," 521 U. S., at 830, was not *sub judice* in

*Raines*.[10]

Closer to the mark is this Court's decision in *Coleman* v. *Miller*, 307 U. S. 433 (1939). There, plaintiffs were 20 (of 40) Kansas State Senators, whose votes "would have been sufficient to defeat [a] resolution ratifying [a] proposed [federal] constitutional amendment." *Id.*, at 446.[11] We held they had standing to challenge, as impermissible under Article V of the Federal Constitution, the State Lieutenant Governor's tie-breaking vote for the amend-

_____

[10] *Massachusetts* v. *Mellon*, 262 U. S. 447 (1923), featured in JUSTICE SCALIA's dissent, *post*, at 4, bears little resemblance to this case. There, the Court unanimously found that Massachusetts lacked standing to sue the Secretary of the Treasury on a claim that a federal grant program exceeded Congress' Article I powers and thus violated the Tenth Amendment. *Id.*, at 480. If suing on its own behalf, the Court reasoned, Massachusetts' claim involved no "quasi-sovereign rights actually invaded or threatened." *Id.*, at 485. As *parens patriae*, the Court stated: "[I]t is no part of [Massachusetts'] duty or power to enforce [its citizens'] rights in respect of their relations with the Federal Government. In that field it is the United States, and not the State, which represents them as *parens patriae*." *Id.*, at 485–486. As astutely observed, moreover: "The cases on the standing of states to sue the federal government seem to depend on the kind of claim that the state advances. The decisions . . . are hard to reconcile." R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 263–266 (6th ed. 2009) (comparing *Mellon* with *South Carolina* v. *Katzenbach*, 383 U. S. 301, 308 (1966) (rejecting on the merits the claim that the Voting Rights Act of 1965 invaded reserved powers of the States to determine voter qualifications and regulate elections), *Nebraska* v. *Wyoming*, 515 U. S. 1, 20 (1995) (recognizing that Wyoming could bring suit to vindicate the State's "quasi-sovereign" interests in the physical environment within its domain (emphasis deleted; internal quotation marks omitted)), and *Massachusetts* v. *EPA*, 549 U. S. 497, 520 (2007) (maintaining that Massachusetts "is entitled to special solicitude in our standing analysis")).

[11] *Coleman* concerned the proposed Child Labor Amendment, which provided that "Congress shall have power to limit, regulate, and prohibit the labor of persons under eighteen years of age." 307 U. S., at 435, n. 1 (internal quotation marks omitted).

ment. *Ibid. Coleman*, as we later explained in *Raines*, stood "for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." 521 U. S., at 823.[12] Our conclusion that the Arizona Legislature has standing fits that bill. Proposition 106, together with the Arizona Constitution's ban on efforts to undermine the purposes of an initiative, see *supra,* at 11, would "completely nullif[y]" any vote by the Legislature, now or "in the future," purporting to adopt a redistricting plan. *Raines*, 521 U. S., at 823–824.[13]

This dispute, in short, "will be resolved . . . in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 472 (1982).[14] Accordingly, we

—————

[12] The case before us does not touch or concern the question whether Congress has standing to bring a suit against the President. There is no federal analogue to Arizona's initiative power, and a suit between Congress and the President would raise separation-of-powers concerns absent here. The Court's standing analysis, we have noted, has been "especially rigorous when reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines* v. *Byrd*, 521 U. S. 811, 819–820 (1997).

[13] In an endeavor to wish away *Coleman*, JUSTICE SCALIA, in dissent, suggests the case may have been "a 4-to-4 standoff." *Post*, at 5. He overlooks that Chief Justice Hughes' opinion, announced by Justice Stone, was styled "Opinion of the Court." 307 U. S., at 435. Describing *Coleman*, the Court wrote in *Raines*: "By a vote of 5–4, we held that [the 20 Kansas Senators who voted against ratification of a proposed federal constitutional amendment] had standing." 521 U. S., at 822. For opinions recognizing the precedential weight of *Coleman*, see *Baker* v. *Carr*, 369 U. S. 186, 208 (1962); *United States* v. *Windsor*, 570 U. S. ___, ___ (2013) (ALITO, J., dissenting) (slip op., at 4–5).

[14] Curiously, JUSTICE SCALIA, dissenting on standing, berates the Court for "treading upon the powers of state legislatures." *Post*, at 6.

proceed to the merits.[15]

## III

On the merits, we instructed the parties to address this question: Do the Elections Clause of the United States Constitution and 2 U. S. C. §2a(c) permit Arizona's use of a commission to adopt congressional districts? The Elections Clause is set out at the start of this opinion, *supra*, at 2. Section 2a(c) provides:

> "Until a State is redistricted in the manner provided by the law thereof after any apportionment, the Representatives to which such State is entitled under such apportionment shall be elected in the following manner: [setting out five federally prescribed redistricting procedures]."

Before focusing directly on the statute and constitutional prescriptions in point, we summarize this Court's precedent relating to appropriate state decisionmakers for redistricting purposes. Three decisions compose the relevant case law: *Ohio ex rel. Davis* v. *Hildebrant*, 241 U. S. 565 (1916); *Hawke* v. *Smith (No. 1)*, 253 U. S. 221 (1920); and *Smiley* v. *Holm*, 285 U. S. 355 (1932).

## A

*Davis* v. *Hildebrant* involved an amendment to the Constitution of Ohio vesting in the people the right, exercisable by referendum, to approve or disapprove by popular vote any law enacted by the State's legislature. A 1915 Act redistricting the State for the purpose of congressional

_____

He forgets that the party invoking federal-court jurisdiction in this case, and inviting our review, is the Arizona State Legislature.

[15] JUSTICE THOMAS, on the way to deciding that the Arizona Legislature lacks standing, first addresses the merits. In so doing, he overlooks that, in the cases he features, it was entirely immaterial whether the law involved was adopted by a representative body or by the people, through exercise of the initiative.

elections had been submitted to a popular vote, resulting in disapproval of the legislature's measure. State election officials asked the State's Supreme Court to declare the referendum void. That court rejected the request, holding that the referendum authorized by Ohio's Constitution, "was a part of the legislative power of the State," and "nothing in [federal statutory law] or in [the Elections Clause] operated to the contrary." 241 U. S., at 567. This Court affirmed the Ohio Supreme Court's judgment. In upholding the state court's decision, we recognized that the referendum was "part of the legislative power" in Ohio, *ibid.*, legitimately exercised by the people to disapprove the legislation creating congressional districts. For redistricting purposes, *Hildebrant* thus established, "the Legislature" did not mean the representative body alone. Rather, the word encompassed a veto power lodged in the people. See *id.*, at 569 (Elections Clause does not bar "treating the referendum as part of the legislative power for the purpose of apportionment, where so ordained by the state constitutions and laws").

*Hawke* v. *Smith* involved the Eighteenth Amendment to the Federal Constitution. Ohio's Legislature had ratified the Amendment, and a referendum on that ratification was at issue. Reversing the Ohio Supreme Court's decision upholding the referendum, we held that "ratification by a State of a constitutional amendment is not an act of legislation within the proper sense of the word." 253 U. S., at 229. Instead, Article V governing ratification had lodged in "the legislatures of three-fourths of the several States" sole authority to assent to a proposed amendment. *Id.,* at 226. The Court contrasted the ratifying function, exercisable exclusively by a State's legislature, with "the ordinary business of legislation." *Id.,* at 229. *Davis* v. *Hildebrant*, the Court explained, involved the enactment of legislation, *i.e.*, a redistricting plan, and properly held that "the referendum [was] part of the legislative author-

ity of the State for [that] purpose." 253 U. S., at 230.

*Smiley* v. *Holm* raised the question whether legislation purporting to redistrict Minnesota for congressional elections was subject to the Governor's veto. The Minnesota Supreme Court had held that the Elections Clause placed redistricting authority exclusively in the hands of the State's legislature, leaving no role for the Governor. We reversed that determination and held, for the purpose at hand, Minnesota's legislative authority includes not just the two houses of the legislature; it includes, in addition, a make-or-break role for the Governor. In holding that the Governor's veto counted, we distinguished instances in which the Constitution calls upon state legislatures to exercise a function other than lawmaking. State legislatures, we pointed out, performed an "electoral" function "in the choice of United States Senators under Article I, section 3, prior to the adoption of the Seventeenth Amendment,"[16] a "ratifying" function for "proposed amendments to the Constitution under Article V," as explained in *Hawke* v. *Smith*, and a "consenting" function "in relation to the acquisition of lands by the United States under Article I, section 8, paragraph 17." 285 U. S., at 365–366.

In contrast to those other functions, we observed, redistricting "involves lawmaking in its essential features and most important aspect." *Id.*, at 366. Lawmaking, we further noted, ordinarily "must be in accordance with the method which the State has prescribed for legislative enactments." *Id.*, at 367. In Minnesota, the State's Constitution had made the Governor "part of the legislative process." *Id.*, at 369. And the Elections Clause, we explained, respected the State's choice to include the Governor in that process, although the Governor could play no part when the Constitution assigned to "the Legislature" a

––––––––––

[16] The Seventeenth Amendment provided for election of Senators "by the people" of each State.

ratifying, electoral, or consenting function.  Nothing in the Elections Clause, we said, "attempt[ed] to endow the legislature of the State with power to enact laws in any manner other than that in which the constitution of the State ha[d] provided that laws shall be enacted."  *Id.*, at 368.

THE CHIEF JUSTICE, in dissent, features, indeed trumpets repeatedly, the pre-Seventeenth Amendment regime in which Senators were "chosen [in each State] by the Legislature thereof."  Art. I, §3; see *post*, at 1, 8–9, 19.  If we are right, he asks, why did popular election proponents resort to the amending process instead of simply interpreting "the Legislature" to mean "the people"?  *Post*, at 1.  *Smiley*, as just indicated, answers that question.  Article I, §3, gave state legislatures "a function different from that of lawgiver," 285 U. S., at 365; it made each of them "an electoral body" charged to perform that function to the exclusion of other participants, *ibid.*  So too, of the ratifying function.  As we explained in *Hawke*, "the power to legislate in the enactment of the laws of a State is derived from the people of the State."  253 U. S., at 230.  Ratification, however, "has its source in the Federal Constitution" and is not "an act of legislation within the proper sense of the word."  *Id.,* at 229–230.

Constantly resisted by THE CHIEF JUSTICE, but well understood in opinions that speak for the Court: "[T]he meaning of the word 'legislature,' used several times in the Federal Constitution, differs according to the connection in which it is employed, depend[ent] upon the character of the function which that body in each instance is called upon to exercise."  *Atlantic Cleaners & Dyers, Inc.* v. *United States*, 286 U. S. 427, 434 (1932) (citing *Smiley*, 285 U. S. 355).  Thus "the Legislature" comprises the referendum and the Governor's veto in the context of regulating congressional elections.  *Hildebrant*, see *supra,* at 15–16; *Smiley*, see *supra,* at 17–18.  In the context of ratifying

constitutional amendments, in contrast, "the Legislature" has a different identity, one that excludes the referendum and the Governor's veto. *Hawke*, see *supra*, at 16.[17]

In sum, our precedent teaches that redistricting is a legislative function, to be performed in accordance with the State's prescriptions for lawmaking, which may include the referendum and the Governor's veto. The exercise of the initiative, we acknowledge, was not at issue in our prior decisions. But as developed below, we see no constitutional barrier to a State's empowerment of its people by embracing that form of lawmaking.

## B

We take up next the statute the Court asked the parties to address, 2 U. S. C. §2a(c), a measure modeled on the Reapportionment Act Congress passed in 1911, Act of Aug. 8 (1911 Act), ch. 5, §4, 37 Stat. 14. Section 2a(c), we hold, permits use of a commission to adopt Arizona's congressional districts. See *supra*, at 15.[18]

From 1862 through 1901, the decennial congressional apportionment Acts provided that a State would be re-

-------------

[17] The list of constitutional provisions in which the word "legislature" appears, appended to THE CHIEF JUSTICE's opinion, *post*, at 28–32, is illustrative of the variety of functions state legislatures can be called upon to exercise. For example, Art. I, §2, cl. 1, superseded by the Seventeenth Amendment, assigned an "electoral" function. See *Smiley*, 285 U. S., at 365. Article I, §3, cl. 2, assigns an "appointive" function. Article I, §8, cl. 17, assigns a "consenting" function, see *Smiley*, 285 U. S., at 366, as does Art. IV, §3, cl. 1. "[R]atifying" functions are assigned in Art. V, Amdt. 18, §3, Amdt. 20, §6, and Amdt. 22, §2. See *Hawke*, 253 U. S., at 229. But Art. I, §4, cl. 1, unquestionably calls for the exercise of lawmaking authority. That authority can be carried out by a representative body, but if a State so chooses, legislative authority can also be lodged in the people themselves. See *infra*, at 24–35.

[18] The AIRC referenced §2a(c) in briefing below, see Motion to Dismiss 8–9, and Response to Plaintiff's Motion for Preliminary Injunction 12–14, in No. 12–1211 (D Ariz.), and in its motion to dismiss or affirm in this Court, see Motion to Dismiss or Affirm 28–31.

quired to follow federally prescribed procedures for redistricting unless "the legislature" of the State drew district lines. *E.g.*, Act of July 14, 1862, ch. 170, 12 Stat. 572; Act of Jan. 16, 1901, ch. 93, §4, 31 Stat. 734. In drafting the 1911 Act, Congress focused on the fact that several States had supplemented the representative legislature mode of lawmaking with a direct lawmaking role for the people, through the processes of initiative (positive legislation by the electorate) and referendum (approval or disapproval of legislation by the electorate). 47 Cong. Rec. 3508 (statement of Sen. Burton); see *supra,* at 3–5. To accommodate that development, the 1911 Act eliminated the statutory reference to redistricting by the state "legislature" and instead directed that, if a State's apportionment of Representatives increased, the State should use the Act's default procedures for redistricting "until such State shall be redistricted *in the manner provided by the laws thereof*." Ch. 5, §4, 37 Stat. 14 (emphasis added).[19]

Some Members of Congress questioned whether the language change was needed. In their view, existing apportionment legislation (referring to redistricting by a State's "legislature") "suffic[ed] to allow, whatever the law of the State may be, the people of that State to control [redistricting]." 47 Cong. Rec. 3507 (statement of Sen.

———————

[19] The 1911 Act also required States to comply with certain federally prescribed districting rules—namely, that Representatives be elected "by districts composed of a contiguous and compact territory, and containing as nearly as practicable an equal number of inhabitants," and that the districts "be equal to the number of Representatives to which [the] State may be entitled in Congress, no district electing more than one Representative." Act of Aug. 8, 1911, ch. 5, §§3–4, 37 Stat. 14. When a State's apportionment of Representatives remained constant, the Act directed the State to continue using its pre-existing districts "until [the] State shall be redistricted as herein prescribed." See §4, *ibid.* The 1911 Act did not address redistricting in the event a State's apportionment of Representatives decreased, likely because no State faced a decrease following the 1910 census.

Shively); cf. *Shiel* v. *Thayer*, Bartlett Contested Election Cases, H. R. Misc. Doc. No. 57, 38th Cong., 2d Sess., 351 (1861) (view of House Committee of Elections Member Dawes that Art. I, §4's reference to "the Legislature" meant simply the "constituted authorities, through whom [the State] choose[s] to speak," prime among them, the State's Constitution, "which rises above . . . all legislative action"). Others anticipated that retaining the reference to "the legislature" would "condem[n] . . . any [redistricting] legislation by referendum or by initiative." 47 Cong. Rec. 3436 (statement of Sen. Burton). In any event, proponents of the change maintained, "[i]n view of the very serious evils arising from gerrymanders," Congress should not "take any chances in [the] matter." *Id.*, at 3508 (same). "[D]ue respect to the rights, to the established methods, and to the laws of the respective States," they urged, required Congress "to allow them to establish congressional districts in whatever way they may have provided by their constitution and by their statutes." *Id.,* at 3436; see *id.*, at 3508 (statement of Sen. Works).

As this Court observed in *Hildebrant*, "the legislative history of th[e] [1911 Act] leaves no room for doubt [about why] the prior words were stricken out and the new words inserted." 241 U. S., at 568. The change was made to safeguard to "each State full authority to employ in the creation of congressional districts its own laws and regulations." 47 Cong. Rec. 3437 (statement of Sen. Burton). The 1911 Act, in short, left the question of redistricting "to the laws and methods of the States. If they include initiative, it is included." *Id.,* at 3508.

While the 1911 Act applied only to reapportionment following the 1910 census, see *Wood* v. *Broom*, 287 U. S. 1, 6–7 (1932), Congress used virtually identical language when it enacted §2a(c) in 1941. See Act of Nov. 15, 1941, ch. 470, 55 Stat. 761–762. Section 2a(c) sets forth congressional-redistricting procedures operative only if the

State, "after any apportionment," had not redistricted "in
the manner provided by the law thereof." The 1941 provi-
sion, like the 1911 Act, thus accorded full respect to the
redistricting procedures adopted by the States. So long as
a State has "redistricted in the manner provided by the
law thereof"—as Arizona did by utilizing the independent
commission procedure called for by its Constitution—the
resulting redistricting plan becomes the presumptively
governing map.[20]

The Arizona Legislature characterizes §2a(c) as an
"obscure provision, narrowed by subsequent developments
to the brink of irrelevance." Brief for Appellant 56. True,
four of the five default redistricting procedures—operative
only when a State is *not* "redistricted in the manner pro-
vided by [state] law"—had "become (because of postenact-
ment decisions of this Court) in virtually all situations
plainly unconstitutional." *Branch* v. *Smith*, 538 U. S. 254,
273–274 (2003) (plurality opinion). Concretely, the default
procedures specified in §2a(c)(1)–(4) contemplate that a
State would continue to use pre-existing districts following
a new census. The one-person, one-vote principle an-
nounced in *Wesberry* v. *Sanders*, 376 U. S. 1 (1964), how-
ever, would bar those procedures, except in the "unlikely"
event that "the decennial census makes no districting
change constitutionally necessary," *Branch*, 538 U. S., at
273 (plurality opinion).

Constitutional infirmity in §2a(c)(1)–(4)'s default proce-
dures, however, does not bear on the question whether a
State has been "redistricted in the manner provided by
[state] law."[21] As just observed, Congress expressly di-

—————

[20] Because a State is required to comply with the Federal Constitu-
tion, the Voting Rights Act, and other federal laws when it draws and
implements its district map, nothing in §2a(c) affects a challenge to a
state district map on the ground that it violates one or more of those
federal requirements.

[21] The plurality in *Branch* v. *Smith*, 538 U. S. 254, 273 (2003), consid-

rected that when a State has been "redistricted in the manner provided by [state] law"—whether by the legislature, court decree (see *id.*, at 274), or a commission established by the people's exercise of the initiative—the resulting districts are the ones that presumptively will be used to elect Representatives.[22]

There can be no dispute that Congress itself may draw a State's congressional-district boundaries. See *Vieth*, 541 U. S., at 275 (plurality opinion) (stating that the Elections Clause "permit[s] Congress to 'make or alter'" the "districts for federal elections"). The Arizona Legislature urges that the first part of the Elections Clause, vesting power to regulate congressional elections in State "Legislature[s]," precludes Congress from allowing a State to redistrict without the involvement of its representative body, even if Congress independently could enact the same redistricting plan under its plenary authority to "make or alter" the State's plan. See Brief for Appellant 56–57; Reply Brief 17. In other words, the Arizona Legislature regards §2a(c) as a futile exercise. The Congresses that passed §2a(c) and its forerunner, the 1911 Act, did not share that wooden interpretation of the Clause, nor do we. Any uncertainty about the import of §2a(c), however, is resolved by our holding that the Elections Clause permits regulation of congressional elections by initiative, see *infra*, at 24–35, leaving no arguable conflict between §2a(c) and the first part of the Clause.

---

ered the question whether §2a(c) had been repealed by implication and stated, "where what it prescribes is constitutional," the provision "continues to apply."

[22] THE CHIEF JUSTICE, in dissent, insists that §2a(c) and its precursor, the 1911 Act, have nothing to do with this case. *Post*, at 20–21, 23. Undeniably, however, it was the very purpose of the measures to recognize the legislative authority each State has to determine its own redistricting regime.

C

In accord with the District Court, see *supra,* at 9, we hold that the Elections Clause permits the people of Arizona to provide for redistricting by independent commission. To restate the key question in this case, the issue centrally debated by the parties: Absent congressional authorization, does the Elections Clause preclude the people of Arizona from creating a commission operating independently of the state legislature to establish congressional districts? The history and purpose of the Clause weigh heavily against such preclusion, as does the animating principle of our Constitution that the people themselves are the originating source of all the powers of government.

We note, preliminarily, that dictionaries, even those in circulation during the founding era, capaciously define the word "legislature." Samuel Johnson defined "legislature" simply as "[t]he power that makes laws." 2 A Dictionary of the English Language (1st ed. 1755); *ibid.* (6th ed. 1785); *ibid.* (10th ed. 1792); *ibid.* (12th ed. 1802). Thomas Sheridan's dictionary defined "legislature" exactly as Dr. Johnson did: "The power that makes laws." 2 A Complete Dictionary of the English Language (4th ed. 1797). Noah Webster defined the term precisely that way as well. Compendious Dictionary of the English Language 174 (1806). And Nathan Bailey similarly defined "legislature" as "the Authority of making Laws, or Power which makes them." An Universal Etymological English Dictionary (20th ed. 1763).[23]

————————

[23] Illustrative of an embracive comprehension of the word "legislature," Charles Pinckney explained at South Carolina's ratifying convention that America is "[a] republic, where the people at large, either collectively or by representation, form the legislature." 4 Debates on the Federal Constitution 328 (J. Elliot 2d ed. 1863). Participants in the debates over the Elections Clause used the word "legislature" interchangeably with "state" and "state government." See Brief for Brennan

Opinion of the Court

As to the "power that makes laws" in Arizona, initiatives adopted by the voters legislate for the State just as measures passed by the representative body do. See Ariz. Const., Art. IV, pt. 1, §1 ("The legislative authority of the state shall be vested in the legislature, consisting of a senate and a house of representatives, but the people reserve the power to propose laws and amendments to the constitution and to enact or reject such laws and amendments at the polls, independently of the legislature."). See also *Eastlake* v. *Forest City Enterprises, Inc.*, 426 U. S. 668, 672 (1976) ("In establishing legislative bodies, the people can reserve to themselves power to deal directly with matters which might otherwise be assigned to the legislature."). As well in Arizona, the people may delegate their legislative authority over redistricting to an independent commission just as the representative body may choose to do. See Tr. of Oral Arg. 15–16 (answering the Court's question, may the Arizona Legislature itself establish a commission to attend to redistricting, counsel for appellant responded yes, state legislatures may delegate their authority to a commission, subject to their prerogative to reclaim the authority for themselves).

1

The dominant purpose of the Elections Clause, the historical record bears out, was to empower Congress to override state election rules, not to restrict the way States enact legislation. As this Court explained in *Arizona* v. *Inter Tribal Council of Ariz., Inc.*, 570 U. S. 1 (2013), the Clause "was the Framers' insurance against the possibility that a State would refuse to provide for the election of representatives to the Federal Congress." *Id.*, at \_\_\_ (slip op., at 5) (citing The Federalist No. 59, pp. 362–363 (C. Rossiter ed. 1961) (A. Hamilton)).

─────────

Center for Justice at N. Y. U. School of Law as *Amicus Curiae* 6–7.

The Clause was also intended to act as a safeguard against manipulation of electoral rules by politicians and factions in the States to entrench themselves or place their interests over those of the electorate. As Madison urged, without the Elections Clause, "[w]henever the State Legislatures had a favorite measure to carry, they would take care so to mould their regulations as to favor the candidates they wished to succeed." 2 Records of the Federal Convention 241 (M. Farrand rev. 1966). Madison spoke in response to a motion by South Carolina's delegates to strike out the federal power. Those delegates so moved because South Carolina's coastal elite had malapportioned their legislature, and wanted to retain the ability to do so. See J. Rakove, Original Meanings: Politics and Ideas in the Making of the Constitution 223–224 (1996). The problem Madison identified has hardly lessened over time. Conflict of interest is inherent when "legislators dra[w] district lines that they ultimately have to run in." Cain, 121 Yale L. J., at 1817.

Arguments in support of congressional control under the Elections Clause were reiterated in the public debate over ratification. Theophilus Parsons, a delegate at the Massachusetts ratifying convention, warned that "when faction and party spirit run high," a legislature might take actions like "mak[ing] an unequal and partial division of the states into districts for the election of representatives." Debate in Massachusetts Ratifying Convention (16–17, 21 Jan. 1788), in 2 The Founders' Constitution 256 (P. Kurland & R. Lerner eds. 1987). Timothy Pickering of Massachusetts similarly urged that the Clause was necessary because "the State governments *may* abuse their power, and regulate . . . elections in such manner as would be highly inconvenient to the people." Letter to Charles Tillinghast (24 Dec. 1787), in *id.,* at 253. He described the Clause as a way to "ensure to the *people* their rights of election." *Ibid.*

Opinion of the Court

While attention focused on potential abuses by state-level politicians, and the consequent need for congressional oversight, the legislative processes by which the States could exercise their initiating role in regulating congressional elections occasioned no debate. That is hardly surprising. Recall that when the Constitution was composed in Philadelphia and later ratified, the people's legislative prerogatives—the initiative and the referendum— were not yet in our democracy's arsenal. See *supra,* at 3– 5. The Elections Clause, however, is not reasonably read to disarm States from adopting modes of legislation that place the lead rein in the people's hands.[24]

2

The Arizona Legislature maintains that, by specifying "the Legislature thereof," the Elections Clause renders the State's representative body the sole "component of state government authorized to prescribe . . . regulations . . . for congressional redistricting." Brief for Appellant 30. THE CHIEF JUSTICE, in dissent, agrees. But it is characteristic of our federal system that States retain autonomy to establish their own governmental processes. See *Alden* v. *Maine*, 527 U. S. 706, 752 (1999) ("A State is entitled to order the processes of its own governance."); The Federalist No. 43, at 272 (J. Madison) ("Whenever the States may choose to substitute other republican forms, they have a

_____

[24] THE CHIEF JUSTICE, in dissent, cites *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779 (1995), as an important precedent we overlook. *Post*, at 24–25. There, we held that state-imposed term limits on candidates for the House and Senate violated the Clauses of the Constitution setting forth qualifications for membership in Congress, Art. I, §2, cl. 2, and Art. I, §3, cl. 3. We did so for a reason entirely harmonious with today's decision. Adding state-imposed limits to the qualifications set forth in the Constitution, the Court wrote, would be "contrary to the 'fundamental principle of our representative democracy,' . . . that 'the people should choose whom they please to govern them.'" 514 U. S., at 783 (quoting *Powell* v. *McCormack*, 395 U. S. 486, 547 (1969)).

right to do so."). "Through the structure of its govern-
ment, and the character of those who exercise government
authority, a State defines itself as a sovereign." *Gregory* v.
*Ashcroft*, 501 U. S. 452, 460 (1991). Arizona engaged in
definition of that kind when its people placed both the
initiative power and the AIRC's redistricting authority in
the portion of the Arizona Constitution delineating the
State's legislative authority. See Ariz. Const., Art. IV;
*supra,* at 5–6.

This Court has "long recognized the role of the States as
laboratories for devising solutions to difficult legal prob-
lems." *Oregon* v. *Ice*, 555 U. S. 160, 171 (2009); see *United
States* v. *Lopez*, 514 U. S. 549, 581 (1995) (KENNEDY, J.,
concurring) ("[T]he States may perform their role as lab-
oratories for experimentation to devise various solutions
where the best solution is far from clear."); *New State Ice
Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932) (Brandeis, J.,
dissenting) ("It is one of the happy incidents of the federal
system that a single courageous State may, if its citizens
choose, serve as a laboratory; and try novel social and
economic experiments without risk to the rest of the coun-
try."). Deference to state lawmaking "allows local policies
'more sensitive to the diverse needs of a heterogeneous
society,' permits 'innovation and experimentation,' enables
greater citizen 'involvement in democratic processes,' and
makes government 'more responsive by putting the States
in competition for a mobile citizenry.'" *Bond* v. *United
States*, 564 U. S. ___, ___ (2011) (slip op., at 9) (quoting
*Gregory*, 501 U. S., at 458).

We resist reading the Elections Clause to single out
federal elections as the one area in which States may not
use citizen initiatives as an alternative legislative process.
Nothing in that Clause instructs, nor has this Court ever
held, that a state legislature may prescribe regulations on
the time, place, and manner of holding federal elections in
defiance of provisions of the State's constitution. See

*Shiel*, H. R. Misc. Doc. No. 57, at 349–352 (concluding that Oregon's Constitution prevailed over any conflicting legislative measure setting the date for a congressional election).

THE CHIEF JUSTICE, in dissent, maintains that, under the Elections Clause, the state legislature can trump any initiative-introduced constitutional provision regulating federal elections. He extracts support for this position from *Baldwin* v. *Trowbridge*, 2 Bartlett Contested Election Cases, H. R. Misc. Doc. No. 152, 41st Cong., 2d Sess., 46–47 (1866). See *post*, at 15–16. There, Michigan voters had amended the State Constitution to require votes to be cast within a resident's township or ward. The Michigan Legislature, however, passed a law permitting soldiers to vote in other locations. One candidate would win if the State Constitution's requirement controlled; his opponent would prevail under the Michigan Legislature's prescription. The House Elections Committee, in a divided vote, ruled that, under the Elections Clause, the Michigan Legislature had the paramount power.

As the minority report in *Baldwin* pointed out, however, the Supreme Court of Michigan had reached the opposite conclusion, holding, as courts generally do, that state legislation in direct conflict with the State's constitution is void. *Baldwin*, H. R. Misc. Doc. No. 152, at 50. The *Baldwin* majority's ruling, furthermore, appears in tension with the Election Committee's unanimous decision in *Shiel* just five years earlier. (The Committee, we repeat, "ha[d] no doubt that the constitution of the State ha[d] fixed, beyond the control of the legislature, the time for holding [a congressional] election." *Shiel*, H. R. Misc. Doc. No. 57, at 351.) Finally, it was perhaps not entirely accidental that the candidate the Committee declared winner in *Baldwin* belonged to the same political party as all but one member of the House Committee majority responsible for the decision. See U. S. House of Representatives Con-

gress Profiles: 39th Congress (1865–1867), http://
history.house.gov/Congressional-Overview/Profiles/39th/;
Biographical Directory of the United States Cong-
ress: Trowbridge, Rowland Ebenezer (1821–1881).    Cf.
Cain, 121 Yale L. J., at 1817 (identifying legislative
conflict of interest as the problem independent re-
districting commissions aimed to check).   In short, *Bald-
win* is not a disposition that should attract this Court's
reliance.

We add, furthermore, that the Arizona Legislature does
not question, nor could it, employment of the initiative to
control state and local elections.   In considering whether
Article I, §4, really says "No" to similar control of federal
elections, we have looked to, and borrow from, Alexander
Hamilton's counsel: "[I]t would have been hardly advisable
. . . to establish, as a fundamental point, what would
deprive several States of the convenience of having the
elections for their own governments and for the national
government" held at the same times and places, and in the
same manner.   The Federalist No. 61, at 374.   The Elec-
tions Clause is not sensibly read to subject States to that
deprivation.[25]

3

The Framers may not have imagined the modern initia-
tive process in which the people of a State exercise legisla-
tive power coextensive with the authority of an institu-
tional legislature.   But the invention of the initiative was
in full harmony with the Constitution's conception of the
people as the font of governmental power.   As Madison put
it: "The genius of republican liberty seems to demand . . .
not only that all power should be derived from the people,

---

[25] A State may choose to regulate state and national elections differ-
ently, which is its prerogative under the Clause.   *E.g.*, Ind. Code §3–3–
2–2 (creating backup commission for congressional but not state legis-
lative districts).

but that those intrusted with it should be kept in dependence on the people." *Id.*, No. 37, at 223.

The people's ultimate sovereignty had been expressed by John Locke in 1690, a near century before the Constitution's formation:

> "[T]he Legislative being only a Fiduciary Power to act for certain ends, there remains still in the People a Supream Power to remove or alter the Legislative, when they find the Legislative act contrary to the trust reposed in them. For all Power given with trust for the attaining an end, being limited by that end, whenever that end is manifestly neglected, or opposed, the trust must necessarily be forfeited, and the Power devolve into the hands of those that gave it, who may place it anew where they shall think best for their safety and security." Two Treatises of Government §149, p. 385 (P. Laslett ed. 1964).

Our Declaration of Independence, ¶2, drew from Locke in stating: "Governments are instituted among Men, deriving their just powers from the consent of the governed." And our fundamental instrument of government derives its authority from "We the People." U. S. Const., Preamble. As this Court stated, quoting Hamilton: "[T]he true principle of a republic is, that the people should choose whom they please to govern them." *Powell* v. *McCormack*, 395 U. S. 486, 540–541 (1969) (quoting 2 Debates on the Federal Constitution 257 (J. Elliot ed. 1876)). In this light, it would be perverse to interpret the term "Legislature" in the Elections Clause so as to exclude lawmaking by the people, particularly where such lawmaking is intended to check legislators' ability to choose the district lines they run in, thereby advancing the prospect that Members of Congress will in fact be "chosen . . . by the People of the several States," Art. I, §2. See Cain, 121 Yale L. J., at 1817.

THE CHIEF JUSTICE, in dissent, suggests that independent commissions established by initiative are a high-minded experiment that has failed. *Post*, at 26–27. For this assessment, THE CHIEF JUSTICE cites a three-judge Federal District Court opinion, *Harris* v. *Arizona Independent Redistricting Comm'n*, 993 F. Supp. 2d 1042 (Ariz. 2014). That opinion, he asserts, "detail[s] the partisanship that has affected the Commission." *Post*, at 26. No careful reader could so conclude.

The report of the decision in *Harris* comprises a *per curiam* opinion, an opinion concurring in the judgment by Judge Silver, and a dissenting opinion by Judge Wake. The *per curiam* opinion found "in favor of the Commission." 993 F. Supp. 2d, at 1080. Deviations from the one-person, one-vote principle, the *per curiam* opinion explained at length, were "small" and, in the main, could not be attributed to partisanship. *Ibid.* While partisanship "may have played some role," the *per curiam* opinion stated, deviations were "predominantly a result of the Commission's good-faith efforts to achieve preclearance under the Voting Rights Act." *Id.*, at 1060. Judge Silver, although she joined the *per curiam* opinion, made clear at the very outset of that opinion her finding that "partisanship did not play a role." *Id.*, at 1046, n. 1. In her concurring opinion, she repeated her finding that the evidence did not show partisanship at work, *id.*, at 1087; instead, she found, the evidence "[was] overwhelming [that] the final map was a product of the commissioners's consideration of appropriate redistricting criteria." *Id.*, at 1088. To describe *Harris* as a decision criticizing the Commission for pervasive partisanship, *post*, at 26, THE CHIEF JUSTICE could rely only upon the dissenting opinion, which expressed views the majority roundly rejected.

Independent redistricting commissions, it is true, "have not eliminated the inevitable partisan suspicions associated with political line-drawing." Cain, 121 Yale L. J., at

1808. But "they have succeeded to a great degree [in limiting the conflict of interest implicit in legislative control over redistricting]." *Ibid.* They thus impede legislators from choosing their voters instead of facilitating the voters' choice of their representatives.

4

Banning lawmaking by initiative to direct a State's method of apportioning congressional districts would do more than stymie attempts to curb partisan gerrymandering, by which the majority in the legislature draws district lines to their party's advantage. It would also cast doubt on numerous other election laws adopted by the initiative method of legislating.

The people, in several States, functioning as the lawmaking body for the purpose at hand, have used the initiative to install a host of regulations governing the "Times, Places and Manner" of holding federal elections. Art. I, §4. For example, the people of California provided for permanent voter registration, specifying that "no amendment by the Legislature shall provide for a general biennial or other periodic reregistration of voters." Cal. Elec. Code Ann. §2123 (West 2003). The people of Ohio banned ballots providing for straight-ticket voting along party lines. Ohio Const., Art. V, §2a. The people of Oregon shortened the deadline for voter registration to 20 days prior to an election. Ore. Const., Art. II, §2. None of those measures permit the state legislatures to override the people's prescriptions. The Arizona Legislature's theory—that the lead role in regulating federal elections cannot be wrested from "the Legislature," and vested in commissions initiated by the people—would endanger all of them.

The list of endangered state elections laws, were we to sustain the position of the Arizona Legislature, would not stop with popular initiatives. Almost all state constitutions were adopted by conventions and ratified by voters

at the ballot box, without involvement or approval by "the Legislature."[26]   Core aspects of the electoral process regulated by state constitutions include voting by "ballot" or "secret ballot,"[27] voter registration,[28] absentee voting,[29] vote counting,[30] and victory thresholds.[31]   Again, the States' legislatures had no hand in making these laws and may not alter or amend them.

The importance of direct democracy as a means to control election regulations extends beyond the particular statutes and constitutional provisions installed by the people rather than the States' legislatures.   The very prospect of lawmaking by the people may influence the legislature when it considers (or fails to consider) election-related measures.   See Persily & Anderson, Regulating Democracy Through Democracy: The Use of Direct Legis-

————————

[26] See App. to Brief for Appellees 11a–29a (collecting state constitutional provisions governing elections).   States' constitutional conventions are not simply past history predating the first election of state legislatures.   Louisiana, for example, held the most recent of its 12 constitutional conventions in 1992.   J. Dinan, The American State Constitutional Tradition 8–9 (2006) (Table 1–1).   The State's provision for voting by "secret ballot" may be traced to the constitutional convention held by the State in 1812, see La. Const., Art. VI, §13, but was most recently reenacted at the State's 1974 constitutional convention, see Art. XI, §2.

[27] Madison called the decision "[w]hether the electors should vote by ballot or vivâ voce" a quintessential subject of regulation under the Elections Clause.   2 Records of the Federal Convention 240–241 (M. Farrand rev. 1966).

[28] Miss. Const., Art. XII, §249; N. C. Const., Art. VI, §3; Va. Const., Art. II, §2; W. Va. Const., Art. IV, §12; Wash. Const., Art. VI, §7.

[29] *E.g.*, Haw. Const., Art. II, §4; La. Const., Art XI, §2; N. D. Const., Art. II, §1; Pa. Const., Art. VII, §14.

[30] *E.g.*, Ark. Const., Art. III, §11 (ballots unlawfully not counted in the first instance must be counted after election); La. Const., Art XI, §2 (all ballots must be counted publicly).

[31] *E.g.*, Ariz. Const., Art. VII, §7 (setting plurality of votes as the standard for victory in all elections, excluding runoffs); Mont. Const., Art. IV, §5 (same); Ore. Const., Art. II, §16 (same).

lation in Election Law Reform, 78 S. Cal. L. Rev. 997, 1006–1008 (2005) (describing cases in which "indirect pressure of the initiative process . . . was sufficient to spur [state] legislature[s] to action"). Turning the coin, the legislature's responsiveness to the people its members represent is hardly heightened when the representative body can be confident that what it does will not be overturned or modified by the voters themselves.

\*    \*    \*

Invoking the Elections Clause, the Arizona Legislature instituted this lawsuit to disempower the State's voters from serving as the legislative power for redistricting purposes. But the Clause surely was not adopted to diminish a State's authority to determine its own lawmaking processes. Article I, §4, stems from a different view. Both parts of the Elections Clause are in line with the fundamental premise that all political power flows from the people. *McCulloch* v. *Maryland*, 4 Wheat. 316, 404–405 (1819). So comprehended, the Clause doubly empowers the people. They may control the State's lawmaking processes in the first instance, as Arizona voters have done, and they may seek Congress' correction of regulations prescribed by state legislatures.

The people of Arizona turned to the initiative to curb the practice of gerrymandering and, thereby, to ensure that Members of Congress would have "an habitual recollection of their dependence on the people." The Federalist No. 57, at 350 (J. Madison). In so acting, Arizona voters sought to restore "the core principle of republican government," namely, "that the voters should choose their representatives, not the other way around." Berman, Managing Gerrymandering, 83 Texas L. Rev. 781 (2005). The Elections Clause does not hinder that endeavor.

For the reasons stated, the judgment of the United States District Court for the District of Arizona is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

No. 13–1314

ARIZONA STATE LEGISLATURE, APPELLANT *v.* ARIZONA INDEPENDENT REDISTRICTING COMMISSION ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

[June 29, 2015]

CHIEF JUSTICE ROBERTS, with whom JUSTICE SCALIA, JUSTICE THOMAS, and JUSTICE ALITO join, dissenting.

Just over a century ago, Arizona became the second State in the Union to ratify the Seventeenth Amendment. That Amendment transferred power to choose United States Senators from "the Legislature" of each State, Art. I, §3, to "the people thereof." The Amendment resulted from an arduous, decades-long campaign in which reformers across the country worked hard to garner approval from Congress and three-quarters of the States.

What chumps! Didn't they realize that all they had to do was interpret the constitutional term "the Legislature" to mean "the people"? The Court today performs just such a magic trick with the Elections Clause. Art. I, §4. That Clause vests congressional redistricting authority in "the Legislature" of each State. An Arizona ballot initiative transferred that authority from "the Legislature" to an "Independent Redistricting Commission." The majority approves this deliberate constitutional evasion by doing what the proponents of the Seventeenth Amendment dared not: revising "the Legislature" to mean "the people."

The Court's position has no basis in the text, structure, or history of the Constitution, and it contradicts precedents from both Congress and this Court. The Constitu-

tion contains seventeen provisions referring to the "Legislature" of a State, many of which cannot possibly be read to mean "the people." See Appendix, *infra*. Indeed, several provisions expressly distinguish "the Legislature" from "the People." See Art. I, §2; Amdt. 17. This Court has accordingly defined "the Legislature" in the Elections Clause as "*the representative body* which ma[kes] the laws of the people." *Smiley* v. *Holm*, 285 U. S. 355, 365 (1932) (quoting *Hawke* v. *Smith (No. 1)*, 253 U. S. 221, 227 (1920); emphasis added).

The majority largely ignores this evidence, relying instead on disconnected observations about direct democracy, a contorted interpretation of an irrelevant statute, and naked appeals to public policy. Nowhere does the majority explain how a constitutional provision that vests redistricting authority in "the Legislature" permits a State to wholly exclude "the Legislature" from redistricting. Arizona's Commission might be a noble endeavor— although it does not seem so "independent" in practice— but the "fact that a given law or procedure is efficient, convenient, and useful . . . will not save it if it is contrary to the Constitution." *INS* v. *Chadha*, 462 U. S. 919, 944 (1983). No matter how concerned we may be about partisanship in redistricting, this Court has no power to gerrymander the Constitution. I respectfully dissent.

## I

The majority begins by discussing policy. I begin with the Constitution. The Elections Clause provides:

> "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." Art. I, §4, cl. 1.

The Elections Clause both imposes a duty on States and assigns that duty to a particular state actor: In the absence of a valid congressional directive to the contrary, States must draw district lines for their federal representatives. And that duty "shall" be carried out "in each State by the Legislature thereof."

In Arizona, however, redistricting is not carried out by the legislature. Instead, as the result of a ballot initiative, an unelected body called the Independent Redistricting Commission draws the lines. See *ante*, at 6–7. The key question in the case is whether the Commission can conduct congressional districting consistent with the directive that such authority be exercised "by the Legislature."

The majority concedes that the unelected Commission is not "the Legislature" of Arizona. The Court contends instead that the people of Arizona as a whole constitute "the Legislature" for purposes of the Elections Clause, and that they may delegate the congressional districting authority conferred by that Clause to the Commission. *Ante*, at 25. The majority provides no support for the delegation part of its theory, and I am not sure whether the majority's analysis is correct on that issue. But even giving the Court the benefit of the doubt in that regard, the Commission is still unconstitutional. Both the Constitution and our cases make clear that "the Legislature" in the Elections Clause is the representative body which makes the laws of the people.

## A

The majority devotes much of its analysis to establishing that the people of Arizona may exercise lawmaking power under their State Constitution. See *ante*, at 5–6, 25, 27–28. Nobody doubts that. This case is governed, however, by the Federal Constitution. The States do not, in the majority's words, "retain autonomy to establish their own governmental processes," *ante*, at 27, if those

"processes" violate the United States Constitution. In a conflict between the Arizona Constitution and the Elections Clause, the State Constitution must give way. Art. VI, cl. 2; *Cook* v. *Gralike*, 531 U. S. 510, 523 (2001). The majority opinion therefore largely misses the point.

The relevant question in this case is how to define "the Legislature" under the Elections Clause. The majority opinion does not seriously turn to that question until page 24, and even then it fails to provide a coherent answer. The Court seems to conclude, based largely on its understanding of the "history and purpose" of the Elections Clause, *ante*, at 24, that "the Legislature" encompasses any entity in a State that exercises legislative power. That circular definition lacks any basis in the text of the Constitution or any other relevant legal source.

The majority's textual analysis consists, in its entirety, of one paragraph citing founding era dictionaries. The majority points to various dictionaries that follow Samuel Johnson's definition of "legislature" as the "power that makes laws." *Ibid.* (internal quotation marks omitted). The notion that this definition corresponds to the entire population of a State is strained to begin with, and largely discredited by the majority's own admission that "[d]irect lawmaking by the people was virtually unknown when the Constitution of 1787 was drafted." *Ante*, at 3 (internal quotation marks omitted); see *ante*, at 27. Moreover, Dr. Johnson's first example of the usage of "legislature" is this: "Without the concurrent consent of all three parts of the legislature, no law is or can be made." 2 A Dictionary of the English Language (1st ed. 1755) (emphasis deleted). Johnson borrowed that sentence from Matthew Hale, who defined the "Three Parts of the Legislature" of England as the King and the two houses of Parliament. History of the Common Law of England 2 (1713). (The contrary notion that the people as a whole make the laws would have cost you your head in England in 1713.) Thus, even under the

majority's preferred definition, "the Legislature" referred to an institutional body of representatives, not the people at large.

Any ambiguity about the meaning of "the Legislature" is removed by other founding era sources. "[E]very state constitution from the Founding Era that used the term legislature defined it as a distinct multimember entity comprised of representatives." Morley, The Intratextual Independent "Legislature" and the Elections Clause, 109 Nw. U. L. Rev. Online 131, 147, and n. 101 (2015) (citing eleven State Constitutions). The Federalist Papers are replete with references to "legislatures" that can only be understood as referring to representative institutions. *E.g.*, The Federalist No. 27, pp. 174–175 (C. Rossiter ed. 1961) (A. Hamilton) (describing "the State legislatures" as "select bodies of men"); *id.*, No. 60, at 368 (contrasting "the State legislatures" with "the people"). Noah Webster's heralded American Dictionary of the English Language defines "legislature" as "[t]he body of men in a state or kingdom, invested with power to make and repeal laws." 2 An American Dictionary of the English Language (1828). It continues, "The legislatures of most of the states in America . . . consist of two houses or branches." *Ibid.* (emphasis deleted).

I could go on, but the Court has said this before. As we put it nearly a century ago, "Legislature" was "not a term of uncertain meaning when incorporated into the Constitution." *Hawke*, 253 U. S., at 227. "What it meant when adopted it still means for the purpose of interpretation." *Ibid.* "A Legislature" is "the representative body which ma[kes] the laws of the people." *Ibid.*; see *Smiley*, 285 U. S., at 365 (relying on this definition); *Colorado Gen. Assembly* v. *Salazar*, 541 U. S. 1093, 1095 (2004) (Rehnquist, C. J., dissenting from denial of certiorari) (same).

B

The unambiguous meaning of "the Legislature" in the Elections Clause as a representative body is confirmed by other provisions of the Constitution that use the same term in the same way. When seeking to discern the meaning of a word in the Constitution, there is no better dictionary than the rest of the Constitution itself. Our precedents new and old have employed this structural method of interpretation to read the Constitution in the manner it was drafted and ratified—as a unified, coherent whole. See, *e.g., NLRB* v. *Noel Canning*, 573 U. S. ___, ___–___ (2014) (slip op., at 19–20); *id.*, at ___ (SCALIA, J., concurring in judgment) (slip op., at 32); *McCulloch* v. *Maryland*, 4 Wheat. 316, 414–415 (1819); *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 328–330 (1816); Amar, Intratextualism, 112 Harv. L. Rev. 747 (1999).

The Constitution includes seventeen provisions referring to a State's "Legislature."  See Appendix, *infra.* Every one of those references is consistent with the understanding of a legislature as a representative body.  More importantly, many of them are only consistent with an institutional legislature—and flatly incompatible with the majority's reading of "the Legislature" to refer to the people as a whole.

Start with the Constitution's first use of the term: "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."  Art. I, §2, cl. 1.  This reference to a "Branch of the State Legislature" can only be referring to an institutional body, and the explicit juxtaposition of "the State Legislature" with "the People of the several States" forecloses the majority's proposed reading.

The next Section of Article I describes how to fill vacan-

cies in the United States Senate: "if Vacancies happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies." §3, cl. 2.[1] The references to "the Recess of the Legislature of any State" and "the next Meeting of the Legislature" are only consistent with an institutional legislature, and make no sense under the majority's reading. The people as a whole (schoolchildren and a few unnamed others excepted) do not take a "Recess."

The list goes on. Article IV provides that the "United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened), against domestic Violence." §4. It is perhaps conceivable that all the people of a State could be "convened"—although this would seem difficult during an "Invasion" or outbreak of "domestic Violence"—but the only natural reading of the Clause is that "the Executive" may submit a federal application when "the Legislature" as a representative body cannot be convened.

Article VI provides that the "Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution." Cl. 3. Unless the majority is prepared to make all the people of every State swear an "Oath or Affirmation, to support this Constitution," this provision can only refer to the "several State Legislatures" in their institutional capacity.

Each of these provisions offers strong structural indica-

---

[1] This provision was modified by the Seventeenth Amendment.

tions about what "the Legislature" must mean.  But the most powerful evidence of all comes from the Seventeenth Amendment.  Under the original Constitution, Senators were "chosen by the Legislature" of each State, Art. I, §3, cl. 1, while Members of the House of Representatives were chosen "by the People," Art. I, §2, cl. 1.  That distinction was critical to the Framers.  As James Madison explained, the Senate would "derive its powers from the States," while the House would "derive its powers from the people of America."  The Federalist No. 39, at 244.  George Mason believed that the power of state legislatures to select Senators would "be a reasonable guard" against "the Danger . . . that the national, will swallow up the State Legislatures."  1 Records of the Federal Convention of 1787, p. 160 (M. Farrand ed. 1911).  Not everyone agreed. James Wilson proposed allowing the people to elect Senators directly.  His proposal was rejected ten to one.  Debates in the Federal Convention of 1787, S. Doc. No. 404, 57th Cong., 1st Sess., 8 (1902).

Before long, reformers took up Wilson's mantle and launched a protracted campaign to amend the Constitution.  That effort began in 1826, when Representative Henry Storrs of New York proposed—but then set aside—a constitutional amendment transferring the power to elect Senators from the state legislatures to the people.  2 Cong. Deb. 1348–1349.  Over the next three-quarters of a century, no fewer than 188 joint resolutions proposing similar reforms were introduced in both Houses of Congress.  1 W. Hall, The History and Effect of the Seventeenth Amendment 183–184 (1936).

At no point in this process did anyone suggest that a constitutional amendment was unnecessary because "Legislature" could simply be interpreted to mean "people." See *Hawke*, 253 U. S., at 228 ("It was never suggested, so far as we are aware, that the purpose of making the office of Senator elective by the people could be accomplished by

a referendum vote. The necessity of the amendment to accomplish the purpose of popular election is shown in the adoption of the amendment."). In fact, as the decades rolled by without an amendment, 28 of the 45 States settled for the next best thing by holding a popular vote on candidates for Senate, then pressuring state legislators into choosing the winner. See, *e.g.,* Abstract of Laws Relating to the Election of United States Senators, S. Doc. No. 393, 59th Cong., 2d Sess. (1907). All agreed that cutting the state legislature out of senatorial selection entirely would require nothing less than to "Strike out" the original words in the Constitution and "insert, 'elected by the people'" in its place. Cong. Globe, 31st Cong., 1st Sess., 88 (1849) (proposal of Sen. Jeremiah Clemens).

Yet that is precisely what the majority does to the Elections Clause today—amending the text not through the process provided by Article V, but by judicial decision. The majority's revision renders the Seventeenth Amendment an 86-year waste of time, and singles out the Elections Clause as the only one of the Constitution's seventeen provisions referring to "the Legislature" that departs from the ordinary meaning of the term.

The Commission had no answer to this point. See Tr. of Oral Arg. 42 (JUSTICE ALITO: "Is there any other provision where legislature means anything other than the conventional meaning?" Appellee: "I don't know the answer to that question.").

The Court's response is not much better. The majority observes that "the Legislature" of a State may perform different functions under different provisions of the Constitution. Under Article I, §3, for example, "the Legislature" performed an "electoral" function by choosing Senators. The "Legislature" plays a "consenting" function under Article I, §8, and Article IV, §3; a "ratifying" function under Article V; and a "lawmaking" function under the Elections Clause. *Ante*, at 19, and n. 17. All true. The

majority, however, leaps from the premise that "the Legislature" performs different *functions* under different provisions to the conclusion that "the Legislature" assumes different *identities* under different provisions.

As a matter of ordinary language and common sense, however, a difference in function does not imply a difference in meaning. A car, for example, generally serves a transportation function. But it can also fulfill a storage function. At a tailgate party or a drive-in movie, it may play an entertainment function. In the absence of vacancies at the roadside motel, it could provide a lodging function. To a neighbor with a dead battery, it offers an electricity generation function. And yet, a person describing a "car" engaged in any of these varied functions would undoubtedly be referring to the same thing.

The Constitution itself confirms this point. Articles I and II assign many different functions to the Senate: a lawmaking function, an impeachment trial function, a treaty ratification function, an appointee confirmation function, an officer selection function, a qualification judging function, and a recordkeeping function. Art. I, §1; §3, cls. 5, 6; §5, cls. 1, 3; §7, cl. 2; Art. II, §2, cl. 2. Yet the identity of the Senate remains the same as it discharges these various functions.

Similarly, the House of Representatives performs different functions, including lawmaking, impeachment, and resolving Presidential elections in which no candidate wins a majority in the Electoral College. Art. I, §1; §2, cl. 5; §7, cl. 2; Amdt. 12. The President is assigned not only executive functions, Art. II, but also legislative functions, such as approving or vetoing bills, convening both Houses of Congress, and recommending measures for their consideration, Art. I, §7, cl. 2; Art. II, §3. Courts not only exercise a judicial function, Art. III, §1, but may also perform an appointment function, Art. II, §2, cl. 2. And so on. Neither the majority nor the Commission points to a

single instance in which the identity of these actors changes as they exercise different functions.

The majority attempts to draw support from precedent, but our cases only further undermine its position. In *Hawke*, this Court considered the meaning of "the Legislatur[e]" in Article V, which outlines the process for ratifying constitutional amendments. The Court concluded that "Legislature" meant "the representative body which ma[kes] the laws of the people." 253 U. S., at 227. The Court then explained that "[t]he term is often used in the Constitution *with this evident meaning*." *Ibid.* (emphasis added). The Court proceeded to list other constitutional provisions that assign different functions to the "Legislature," just as the majority does today. *Id.*, at 227–228; see *ante*, at 19, n. 17.

Unlike the majority today, however, the Court in *Hawke* never hinted that the meaning of "Legislature" varied across those different provisions because they assigned different functions. To the contrary, the Court drew inferences from the Seventeenth Amendment and its predecessor, Article I, §3—in which "the Legislature" played an *electoral* function—to define the "Legislature" in Article V, which assigned it a *ratification* function. See 253 U. S., at 228. The Court concluded that "Legislature" refers to a representative body, whatever its function. As the Court put it, "There can be no question that the framers of the Constitution clearly understood and carefully used the terms in which that instrument referred to the action of the legislatures of the States. When they intended that direct action by the people should be had they were no less accurate in the use of apt phraseology to carry out such purpose." *Ibid.* (citing Art. I, §2).

*Smiley*, the leading precedent on the meaning of "the Legislature" in the Elections Clause, reaffirmed the definition announced in *Hawke*. In *Smiley*, the petitioner argued—as the Commission does here—that "the Legisla-

ture" referred not just to "the two houses of the legislature" but to "the entire legislative power of the state . . . however exercised."  Brief for Petitioner, O. T. 1931, No. 617, p. 22 (internal quotation marks omitted).  The Court did not respond by holding, as the majority today suggests, that "'the Legislature' comprises the referendum and the Governor's veto in the context of regulating congressional elections," or that "'the Legislature' has a different identity" in the Elections Clause than it does in Article V.  *Ante,* at 18–19.  Instead, the Court in *Smiley* said this:

> "Much that is urged in argument with regard to the meaning of the term 'Legislature' is beside the point.  As this Court said in *Hawke* . . . the term was not one 'of uncertain meaning when incorporated into the Constitution.  What it meant when adopted it still means for purposes of interpretation.  A Legislature was then the representative body which made the laws of the people.'"   285 U. S., at 365 (quoting *Hawke*, 253 U. S., at 227).

Remarkably, the majority refuses to even acknowledge the definition of "the Legislature" adopted in both *Smiley* and *Hawke*, and instead embraces the interpretation that this Court unanimously rejected more than 80 years ago.[2]

C

The history of the Elections Clause further supports the conclusion that "the Legislature" is a representative body.  The first known draft of the Clause to appear at the Constitutional Convention provided that "Each state shall prescribe the time and manner of holding elections."   1

—————

[2] The only hint of support the majority can glean from precedent is a passing reference in *Atlantic Cleaners & Dyers, Inc.* v. *United States*, 286 U. S. 427, 434 (1932), a case about how to interpret "trade or commerce" in the Sherman Act.  See *ante*, at 18.  And even that selected snippet describes the "legislature" as a "body."  286 U. S., at 434.

Debates on the Federal Constitution 146 (J. Elliot ed. 1836). After revision by the Committee of Detail, the Clause included the important limitation at issue here: "The times and places, and the manner, of holding the elections of the members of each house, shall be prescribed *by the legislature of each state*; but their provisions concerning them may, at any time, be altered *by the legislature of the United States*." *Id.,* at 225 (emphasis added). The insertion of "the legislature" indicates that the Framers thought carefully about which entity within the State was to perform congressional districting. And the parallel between "the legislature of each state" and "the legislature of the United States" further suggests that they meant "the legislature" as a representative body.

As the majority explains, the debate over the ratification of the Elections Clause centered on its second part, which empowers Congress to "make or alter" regulations prescribed by "the Legislature" of a State. See *ante*, at 25–27. Importantly for our purposes, however, both sides in this debate "recognized the distinction between the state legislature and the people themselves." *Brown* v. *Secretary of State of Florida*, 668 F. 3d 1271, 1275–1276, n. 4 (CA11 2012).

The Anti-Federalists, for example, supported vesting election regulation power solely in state legislatures because state "legislatures were more numerous *bodies*, usually *elected annually*, and thus more likely to be in sympathy with the interests *of the people*." Natelson, The Original Scope of the Congressional Power to Regulate Elections, 13 U. Pa. J. Const. L. 1, 31 (2010) (emphasis added) (citing sources from ratification debates). Alexander Hamilton and others responded by raising the specter of state legislatures—which he described as "local administrations"—deciding to "annihilate" the Federal Government by "neglecting to provide for the choice of persons to administer its affairs." The Federalist No. 59, at 363. As

the majority acknowledges, the distinction between "the Legislature" and the people "occasioned no debate." *Ante*, at 27. That is because everybody understood what "the Legislature" meant.

The majority contends that its counterintuitive reading of "the Legislature" is necessary to advance the "animating principle" of popular sovereignty. *Ante*, at 24. But the ratification of the Constitution was the ultimate act of popular sovereignty, and the people who ratified the Elections Clause did so knowing that it assigned authority to "the Legislature" as a representative body. The Elections Clause was not, as the majority suggests, an all-purpose "safeguard against manipulation of electoral rules by politicians." *Ante*, at 26. Like most provisions of the Constitution, the Elections Clause reflected a compromise—a pragmatic recognition that the grand project of forging a Union required everyone to accept some things they did not like. See The Federalist No. 59, at 364 (describing the power allocated to state legislatures as "an evil which could not have been avoided"). This Court has no power to upset such a compromise simply because we now think that it should have been struck differently. As we explained almost a century ago, "[t]he framers of the Constitution might have adopted a different method," but it "is not the function of courts . . . to alter the method which the Constitution has fixed." *Hawke*, 253 U. S., at 227.

D

In addition to text, structure, and history, several precedents interpreting the Elections Clause further reinforce that "the Legislature" refers to a representative body.

The first precedent comes not from this Court, but from Congress. Acting under its authority to serve as "the Judge of the Elections, Returns and Qualifications of its own Members," Art. I, §5, cl. 1, the House of Representa-

tives in 1866 confronted a dispute about who should be seated as the Congressman from the Fifth District of Michigan. At a popular convention, Michigan voters had amended the State Constitution to require votes to be cast within a resident's township or ward. The Michigan Legislature, however, passed a law permitting soldiers to vote in alternative locations. If only the local votes counted, one candidate (Baldwin) would win; if the outside votes were included, the other candidate (Trowbridge) would be entitled to the seat. See *Baldwin* v. *Trowbridge*, 2 Bartlett Contested Election Cases, H. R. Misc. Doc. No. 152, 41st Cong., 2d Sess., 46–47 (1866).

The House Elections Committee explained that the Elections Clause conferred power on "the Legislature" of Michigan to prescribe election regulations. "But," the Committee asked, "what is meant by 'the legislature?' Does it mean the legislative power of the State, which would include a convention authorized to prescribe fundamental law; or does it mean the legislature *eo nomine*, as known in the political history of the country?" *Id.,* at 47. The Committee decided, and the full House agreed, that "the Legislature" in the Elections Clause was the "legislature *eo nomine*"—the legislature *by that name*, a representative body. *Ibid.* That conclusion followed both from the known meaning of "the Legislature" at the time of the framing and the many other uses of the word in the Constitution that would not be compatible with a popular convention. Thus, "[w]here there is a conflict of authority between the constitution and legislature of a State in regard to fixing place of elections, the power of the legislature is paramount." *Id.,* at 46; see *California Democratic Party* v. *Jones*, 530 U. S. 567, 603, and n. 11 (2000) (Stevens, J., dissenting) (relying on *Baldwin* for its conclusion that "the Elections Clause's specific reference to 'the Legislature' is not so broad as to encompass the general 'legislative power of this State'").

The majority draws attention to the minority report in *Baldwin*. *Ante*, at 29. Under the present circumstances, I take some comfort in the Court's willingness to consider dissenting views. Still, the minority report does not diminish the force of *Baldwin*. The report cites a Michigan Supreme Court precedent that allegedly reached a contrary result, but that case turned entirely on state constitutional questions arising from a state election—not federal constitutional questions arising from a federal election. See *People ex rel. Twitchell* v. *Blodgett*, 13 Mich. 127 (1865). The majority also contends that *Baldwin* "appears in tension with" an earlier House Elections Committee precedent. *Ante*, at 29. By its own terms, however, that earlier precedent did not involve a conflict between a state legislative act and a state constitutional provision. See *Shiel* v. *Thayer*, 1 Bartlett Contested Election Cases, H. R. Misc. Doc. No. 57, 38th Cong., 2d Sess., 350 (1861) ("the two branches of the legislature differed upon the question . . . and so the bill never became a law"). In any event, to the degree that the two precedents are inconsistent, the later decision in *Baldwin* should govern.[3]

The next relevant precedent is this Court's decision in *McPherson* v. *Blacker*, 146 U. S. 1 (1892). That case involved a constitutional provision with considerable similarity to the Elections Clause, the Presidential Electors Clause of Article II: "Each State shall appoint, in such Manner *as the Legislature thereof* may direct, a Number of Electors . . . ." §1, cl. 2 (emphasis added). The question was whether the state legislature, as a body of representatives, could divide authority to appoint electors across each of the State's congressional districts. The Court

––––––––––

[3] The majority's suggestion that *Baldwin* should be dismissed as an act of partisanship appears to have no basis, unless one is willing to regard as tainted every decision in favor of a candidate from the same party as a majority of the Elections Committee. *Ante*, at 29–30.

upheld the law and emphasized that the plain text of the Presidential Electors Clause vests the power to determine the manner of appointment in "the Legislature" of the State. That power, the Court explained, "*can neither be taken away nor abdicated.*" 146 U. S., at 35 (emphasis added; internal quotation marks omitted).

Against that backdrop, the Court decided two cases regarding the meaning of "the Legislature" in the Elections Clause. In *Ohio ex rel. Davis* v. *Hildebrant*, 241 U. S. 565 (1916), the Ohio Legislature passed a congressional redistricting law. Under the Ohio Constitution, voters held a referendum on the law and rejected it. A supporter of the law sued on behalf of the State, contending that the referendum "was not and could not be a part of the legislative authority of the State and therefore could have no influence on . . . the law creating congressional districts" under the Elections Clause. *Id.,* at 567.

This Court rejected the challenger's constitutional argument as a nonjusticiable claim that the referendum "causes a State . . . to be not republican" in violation of the Guarantee Clause of the Constitution. *Id.,* at 569 (citing Art. IV, §4). The Court also rejected an argument that Ohio's use of the referendum violated a federal statute, and held that Congress had the power to pass that statute under the Elections Clause. *Id.,* at 568–569. *Hildebrant* in no way suggested that the state legislature could be displaced from the redistricting process, and *Hildebrant* certainly did not hold—as the majority today contends— that "the word ['Legislature' in the Elections Clause] encompassed a veto power lodged in the people." *Ante,* at 16. *Hildebrant* simply approved a State's decision to employ a referendum *in addition to* redistricting by the Legislature. See 241 U. S., at 569. The result of the decision was to send *the Ohio Legislature* back to the drawing board to do the redistricting.

In *Smiley*, the Minnesota Legislature passed a law

adopting new congressional districts, and the Governor exercised his veto power under the State Constitution. As noted above, the Minnesota secretary of state defended the veto on the ground that "the Legislature" in the Elections Clause referred not just to "the two houses of the legislature" but to "the entire legislative power of the state . . . however exercised." This Court rejected that argument, reiterating that the term "Legislature" meant "the representative body which made the laws of the people." 285 U. S., at 365 (quoting *Hawke*, 253 U. S., at 227). The Court nevertheless went on to hold that the Elections Clause did not prevent a State from applying the usual rules of its legislative process—including a gubernatorial veto—to election regulations prescribed by the legislature. 285 U. S., at 373. As in *Hildebrant*, the legislature was not displaced, nor was it redefined; it just had to start on a new redistricting plan.

The majority initially describes *Hildebrant* and *Smiley* as holding that "redistricting is a legislative function, to be performed in accordance with the State's prescriptions for lawmaking, which may include the referendum and the Governor's veto." *Ante*, at 19. That description is true, so far as it goes. But it hardly supports the result the majority reaches here. There is a critical difference between allowing a State to *supplement* the legislature's role in the legislative process and permitting the State to *supplant* the legislature altogether. See *Salazar*, 541 U. S., at 1095 (Rehnquist, C. J., dissenting from denial of certiorari) ("to be consistent with Article I, §4, there must be some limit on the State's ability to define lawmaking by excluding the legislature itself"). Nothing in *Hildebrant*, *Smiley*, or any other precedent supports the majority's conclusion that imposing some constraints on the legislature justifies deposing it entirely.

\*    \*    \*

The constitutional text, structure, history, and precedent establish a straightforward rule: Under the Elections Clause, "the Legislature" is a representative body that, when it prescribes election regulations, may be required to do so within the ordinary lawmaking process, but may not be cut out of that process. Put simply, the state legislature need not be exclusive in congressional districting, but neither may it be excluded.

The majority's contrary understanding requires it to accept a definition of "the Legislature" that contradicts the term's plain meaning, creates discord with the Seventeenth Amendment and the Constitution's many other uses of the term, makes nonsense of the drafting and ratification of the Elections Clause, and breaks with the relevant precedents. In short, the effect of the majority's decision is to erase the words "by the Legislature thereof" from the Elections Clause. That is a judicial error of the most basic order. "It cannot be presumed that any clause in the constitution is intended to be without effect; and therefore such a construction is inadmissible." *Marbury* v. *Madison*, 1 Cranch 137, 174 (1803).

## II

The Court also issues an alternative holding that a federal statute, 2 U. S. C. §2a(c), permits Arizona to vest redistricting authority in the Commission. *Ante,* at 19–23. The majority does not contend that this statutory holding resolves the constitutional question presented, see *ante*, at 23, so its reading of Section 2a(c) is largely beside the point. With respect, its statutory argument is also hard to take seriously. Section 2a(c) does not apply to this case. And even if it did, it would likely be unconstitutional.[4]

---

[4] Not surprisingly, Section 2a(c) was barely raised below and was not addressed by the District Court. See *ante*, at 19, n. 18.

A

Section 2a(c) establishes a number of default rules that govern the States' manner of electing representatives "[u]ntil a State is redistricted in the manner provided by the law thereof." Section 2a(c) is therefore "inapplicable *unless* the state legislature, and state and federal courts, have all failed to redistrict" the State. *Branch* v. *Smith*, 538 U. S. 254, 275 (2003) (plurality opinion); see *id.*, at 298–300 (O'Connor, J., concurring in part and dissenting in part). Here, the Commission *has* redistricted the State "in the manner provided by the law thereof." So by its terms, Section 2a(c) does not come into play in this case.

The majority spends several pages discussing Section 2a(c), but it conspicuously declines to say that the statute actually applies to this case.[5] The majority notes that the pre-1911 versions of Section 2a(c) applied only until "the legislature" redistricted the State, while the post-1911 versions applied only until the State is redistricted "in the manner provided by the law thereof." The majority also describes in detail the legislative history that accompanied the 1911 amendment. But if Section 2a(c) does not apply, its legislative history is doubly irrelevant.

The majority seems to suggest that Section 2a(c) somehow indicates federal approval for the district lines that the Commission has drawn. See *ante*, at 23. But the statute does nothing of the sort. Section 2a(c) explains what rules apply "[u]ntil a State is redistricted"; it says nothing about what rules apply *after* a State is redistricted. And it certainly does not say that the State's redistricting plan will by some alchemy become federal law. No legislative drafter remotely familiar with the English language would say that a State had to follow default

---

[5] The majority is prepared to say that Section 2a(c) has more than "nothing to do with this case." *Ante*, at 23, n. 22. Not exactly a ringing endorsement.

rules "[u]ntil [it] is redistricted in the manner provided by the law thereof," when what he meant was "any redistricting plan that the State adopts shall become federal law." And if the drafter was doing something as significant as transforming state law into federal law, he presumably would have taken care to make that dramatic step "unmistakably clear." *Gregory* v. *Ashcroft*, 501 U. S. 452, 460 (1991) (internal quotation marks omitted). Tellingly, our most recent case on the meaning of Section 2a(c) seems not to have even considered the majority's position. See *Branch*, 538 U. S. 254.

Indeed, the majority does not even seem persuaded by its own argument. The majority quickly cautions, in discussing Section 2a(c), that "a State is required to comply with the Federal Constitution, the Voting Rights Act, and other federal laws when it draws and implements its district map." *Ante*, at 22, n. 20. The majority therefore concludes that "nothing in §2a(c) affects a challenge to a state district map on the ground that it violates one or more of those federal requirements." *Ibid.* But here the Arizona Legislature has challenged "a state district map on the ground that it violates one . . . of those federal requirements"—the Elections Clause. If we take the majority at its word, nothing in Section 2a(c) should affect that challenge.

B

Not only is the majority's reading of Section 2a(c) implausible as a matter of statutory interpretation, it would also likely violate the Constitution in multiple ways.

First, the majority's reading of Section 2a(c) as a statute approving the lines drawn by the Commission would seemingly authorize Congress to alter the Elections Clause. The first part of the Elections Clause gives state legislatures the power to prescribe regulations regarding the times, places, and manner of elections; the second part

of the Clause gives Congress the power to "make or alter such Regulations."  There is a difference between making or altering election regulations prescribed by the state legislature and authorizing an entity *other than the state legislature* to prescribe election regulations.  In essence, the majority's proposed reading permits Congress to use the second part of the Elections Clause to nullify the first.  Yet this Court has expressly held that "Congress ha[s] no power to alter Article I, section 4 [the Elections Clause]." *Smiley*, 285 U. S., at 372; see also *Clinton* v. *City of New York*, 524 U. S. 417 (1998) (Congress may not circumvent Article I constraints on its lawmaking power); *Chadha*, 462 U. S. 919 (same).

Second, the majority's interpretation of Section 2a(c) would create a serious delegation problem.  As a general matter, Congress may pass statutes that delegate some discretion to those who administer the laws.  It is a well-accepted principle, however, that Congress may not delegate authority to one actor when the Constitution vests that authority in another actor.  See *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 472 (2001).  The majority's reading of Section 2a(c) contradicts that rule by allowing Congress to delegate federal redistricting authority to a state entity other than the one in which the Elections Clause vests that authority: "the Legislature."

Third, the majority's interpretation conflicts with our most recent Elections Clause precedent, *Arizona* v. *Inter Tribal Council of Ariz., Inc.*, 570 U. S. 1 (2013).  There we explained that when Congress legislates under the Elections Clause, it "*necessarily* displaces some element of a pre-existing legal regime erected by the States."  *Id.*, at ___ (slip op., at 11).  That is so because "the power the Elections Clause confers [on Congress] is none other than the power to pre-empt."  *Id.*, at ___–___, (slip op., at 11–12).  Put differently, "*all* action under the Elections Clause displaces some element of a pre-existing state regulatory

regime, because the text of the Clause confers the power to do exactly (and only) that." *Id.*, at \_\_\_, n. 6 (slip op., at 11, n. 6). Under the majority's interpretation of Section 2a(c), however, Congress has done the opposite of preempting or displacing state law—it has *adopted* state law.

Normally, when "a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932). The multiple serious constitutional doubts raised by the majority's interpretation of Section 2a(c)—in addition to the sheer weakness of its reading as a textual matter—provide more than enough reason to reject the majority's construction. Section 2a(c) does not apply to this case.

## III

Justice Jackson once wrote that the Constitution speaks in "majestic generalities." *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624, 639 (1943). In many places it does, and so we have cases expounding on "freedom of speech" and "unreasonable searches and seizures." Amdts. 1, 4. Yet the Constitution also speaks in some places with elegant specificity. A Member of the House of Representatives must be 25 years old. Art. I, §2, cl. 2. Every State gets two Senators. Art. I, §3, cl. 1. And the times, places, and manner of holding elections for those federal representatives "shall be prescribed in each State by the Legislature thereof." Art. I, §4, cl. 1.

For the reasons I have explained, there is no real doubt about what "the Legislature" means. The Framers of the Constitution were "practical men, dealing with the facts of political life as they understood them, putting into form the government they were creating, and prescribing in language clear and intelligible the powers that government was to take." *South Carolina* v. *United States*, 199

U. S. 437, 449 (1905). We ought to give effect to the words they used.

The majority today shows greater concern about redistricting practices than about the meaning of the Constitution. I recognize the difficulties that arise from trying to fashion judicial relief for partisan gerrymandering. See *Vieth* v. *Jubelirer*, 541 U. S. 267 (2004); *ante*, at 1. But our inability to find a manageable standard in that area is no excuse to abandon a standard of meaningful interpretation in this area. This Court has stressed repeatedly that a law's virtues as a policy innovation cannot redeem its inconsistency with the Constitution. "Failure of political will does not justify unconstitutional remedies." *Clinton*, 524 U. S., at 449 (KENNEDY, J., concurring); see *Stern* v. *Marshall*, 564 U. S. ___ (2011); *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477 (2010); *Bowsher* v. *Synar*, 478 U. S. 714 (1986); *Chadha*, 462 U. S. 919; *Myers* v. *United States*, 272 U. S. 52 (1926).

Indeed, the Court has enforced the text of the Constitution to invalidate state laws with policy objectives reminiscent of this one. Two of our precedents held that States could not use their constitutions to impose term limits on their federal representatives in violation of the United States Constitution. *Cook*, 531 U. S. 510; *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779 (1995). The people of the States that enacted these reforms surely viewed them as measures that would "place the lead rein in the people's hands." *Ante*, at 27. Yet the Court refused to accept "that the Framers spent significant time and energy in debating and crafting Clauses that could be easily evaded." *Term Limits*, 514 U. S., at 831. The majority approves just such an evasion of the Constitution today.[6]

———————

[6] *Term Limits* was of course not decided on the abstract principle that "the people should choose whom they please to govern them." *Ante*, at 27, n. 24 (quoting 514 U. S., at 783). If that were the rule, the people

The Court also overstates the effects of enforcing the plain meaning of the Constitution in this case. There is no dispute that Arizona may continue to use its Commission to draw lines for state legislative elections. The representatives chosen in those elections will then be responsible for congressional redistricting as members of the state legislature, so the work of the Commission will continue to influence Arizona's federal representation.

Moreover, reading the Elections Clause to require the involvement of the legislature will not affect most other redistricting commissions. As the majority notes, many States have commissions that play an "auxiliary role" in congressional redistricting. *Ante*, at 8, and nn. 8–9. But in these States, unlike in Arizona, the legislature retains primary authority over congressional redistricting. See Brief for National Conference of State Legislatures as *Amicus Curiae* 3–17.

The majority also points to a scattered array of election-related laws and constitutional provisions enacted via popular lawmaking that it claims would be "endangered" by interpreting the Elections Clause to mean what it says. *Ante*, at 33. Reviewing the constitutionality of these far-flung provisions is well outside the scope of this case. Suffice it to say that none of them purports to do what the Arizona Constitution does here: set up an unelected, unaccountable institution that permanently and totally displaces the legislature from the redistricting process. "[T]his wolf comes as a wolf." *Morrison* v. *Olson*, 487 U. S. 654, 699 (1988) (SCALIA, J., dissenting).

Absent from the majority's portrayal of the high motives that inspired the Arizona Commission is any discussion of

_____

could choose a 20-year-old Congressman, a 25-year-old Senator, or a foreign President. But see Art. I, §2, cl. 2; §3, cl. 3; Art. II, §1, cl. 5. *Term Limits* instead relied on analysis of the text, structure, and history of the Constitution—all factors that cut strongly against the majority's position today.

how it has actually functioned. The facts described in a recent opinion by a three-judge District Court detail the partisanship that has affected the Commission on issues ranging from staffing decisions to drawing the district lines. See *Harris* v. *Arizona Independent Redistricting Comm'n*, 993 F. Supp. 2d 1042 (Ariz. 2014). The *per curiam* opinion explained that "partisanship played some role in the design of the map," that "some of the commissioners were motivated in part in some of the linedrawing decisions by a desire to improve Democratic prospects in the affected districts," and that the Commission retained a mapping consultant that "had worked for Democratic, independent, and nonpartisan campaigns, but no Republican campaigns." *Id.*, at 1046, 1047, 1053. The hiring of the mapping consultant provoked sufficient controversy that the Governor of Arizona, supported by two-thirds of the Arizona Senate, attempted to remove the chairwoman of the Commission for "substantial neglect of duty and gross misconduct in office." *Id.*, at 1057; see *Arizona Independent Redistricting Comm'n* v. *Brewer,* 229 Ariz. 347, 275 P. 3d 1267 (2012) (explaining the removal and concluding that the Governor exceeded her authority under the Arizona Constitution).

Judge Silver's separate opinion noted that "the very structure of Arizona's reformed redistricting process reflects that partisanship still plays a prominent role." 993 F. Supp. 2d, at 1083. Judge Wake's separate opinion described the Commission's "systematic overpopulation of Republican plurality districts and underpopulation of Democratic plurality districts" as "old-fashioned partisan malapportionment." *Id.*, at 1091, 1108. In his words, the "Commission has been coin-clipping the currency of our democracy—everyone's equal vote—and giving all the shavings to one party, for no valid reason." *Id.*, at 1092.

The District Court concluded by a two-to-one margin that this partisanship did not rise to the level of a consti-

tutional violation. The case is pending on appeal before this Court, and I take no position on the merits question. But a finding that the partisanship in the redistricting plan did not violate the Constitution hardly proves that the Commission is operating free of partisan influence— and certainly not that it complies with the Elections Clause.

\*    \*    \*

The people of Arizona have concerns about the process of congressional redistricting in their State. For better or worse, the Elections Clause of the Constitution does not allow them to address those concerns by displacing their legislature. But it does allow them to seek relief from Congress, which can make or alter the regulations prescribed by the legislature. And the Constitution gives them another means of change. They can follow the lead of the reformers who won passage of the Seventeenth Amendment. Indeed, several constitutional amendments over the past century have involved modifications of the electoral process. Amdts. 19, 22, 24, 26. Unfortunately, today's decision will only discourage this democratic method of change. Why go through the hassle of writing a new provision into the Constitution when it is so much easier to write an old one out?

I respectfully dissent.

## APPENDIX:
## "LEGISLATURE" IN THE CONSTITUTION

**Art. I, §2, cl. 1**: "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State <u>Legislature</u>."

**Art. I, §3, cl. 1**: "The Senate of the United States shall be composed of two Senators from each State, chosen by the <u>Legislature</u> thereof, for six Years; and each Senator shall have one Vote." (Modified by Amdt. 17.)

**Art. I, §3, cl. 2**: "Immediately after they shall be assembled in Consequence of the first Election, they shall be divided as equally as may be into three Classes. The Seats of the Senators of the first Class shall be vacated at the Expiration of the second Year, of the second Class at the Expiration of the fourth Year, and of the third Class at the Expiration of the sixth Year, so that one third may be chosen every second Year; and if Vacancies happen by Resignation, or otherwise, during the Recess of the <u>Legislature</u> of any State, the Executive thereof may make temporary Appointments until the next Meeting of the <u>Legislature</u>, which shall then fill such Vacancies." (Modified by Amdt. 17.)

**Art. I, §4, cl. 1**: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the <u>Legislature</u> thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

**Art. I, §8, cl. 17**: "To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten

Appendix to opinion of ROBERTS, C. J.

Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the <u>Legislature</u> of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings . . . ."

**Art. II, §1, cl. 2**: "Each State shall appoint, in such Manner as the <u>Legislature</u> thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector."

**Art. IV, §3, cl. 1**: "New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other State; nor any State be formed by the Junction of two or more States, or Parts of States, without the Consent of the <u>Legislatures</u> of the States concerned as well as of the Congress."

**Art. IV, §4**: "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the <u>Legislature</u>, or of the Executive (when the <u>Legislature</u> cannot be convened), against domestic Violence."

**Art. V**: "The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the <u>Legislatures</u> of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case,

shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the <u>Legislatures</u> of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate."

**Art. VI, cl. 3**: "The Senators and Representatives before mentioned, and the Members of the several State <u>Legislatures</u>, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States."

**Amdt. 14, §2**: "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed.  But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the <u>Legislature</u> thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State."  (Modified by Amdts. 19, 26)

Appendix to opinion of ROBERTS, C. J.

**Amdt. 14, §3**: "No person shall be a Senator or Repre-sentative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State <u>legislature</u>, or as an executive or judicial officer of any State, to sup-port the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof.  But Congress may by a vote of two-thirds of each House, remove such disability."

**Amdt. 17, cl. 1**: "The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof, for six years; and each Senator shall have one vote.  The electors in each State shall have the qualifi-cations requisite for electors of the most numerous branch of the State <u>legislatures</u>."

**Amdt. 17, cl. 2**: "When vacancies happen in the represen-tation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such va-cancies: Provided, That the <u>legislature</u> of any State may empower the executive thereof to make temporary ap-pointments until the people fill the vacancies by election as the <u>legislature</u> may direct."

**Amdt. 18, §3**: "This article shall be inoperative unless it shall have been ratified as an amendment to the Constitu-tion by the <u>legislatures</u> of the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress." (Superseded by Amdt. 21.)

32 ARIZONA STATE LEGISLATURE *v.* ARIZONA
INDEPENDENT REDISTRICTING COMM'N
Appendix to opinion of ROBERTS, C. J.

**Amdt. 20, §6**: "This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the <u>legislatures</u> of three-fourths of the several States within seven years from the date of its submission."

**Amdt. 22, §2**: "This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the <u>legislatures</u> of three-fourths of the several States within seven years from the date of its submission to the States by the Congress."

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1314

_____

## ARIZONA STATE LEGISLATURE, APPELLANT *v.* ARIZONA INDEPENDENT REDISTRICTING COMMISSION ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

[June 29, 2015]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

I do not believe that the question the Court answers is properly before us. Disputes between governmental branches or departments regarding the allocation of political power do not in my view constitute "cases" or "controversies" committed to our resolution by Art. III, §2, of the Constitution.

What those who framed and ratified the Constitution had in mind when they entrusted the "judicial Power" to a separate and coequal branch of the Federal Government was the judicial power they were familiar with—that traditionally exercised by English and American courts. The "cases" and "controversies" that those courts entertained did not include suits between units of government regarding their legitimate powers. The job of the courts was, in Chief Justice Marshall's words, "solely, to decide on the rights of individuals," *Marbury* v. *Madison*, 1 Cranch 137, 170 (1803). Tocqueville considered this one reason the new democracy could safely confer upon courts the immense power to hold legislation unconstitutional:

> "[B]y leaving it to private interest to censure the law, and by intimately uniting the trial of the law with the trial of an individual, legislation is protected from

wanton assaults and from the daily aggressions of
party spirit. . . .

"I am inclined to believe this practice of the Ameri-
can courts to be at once most favorable to liberty and
to public order.  If the judge could only attack the leg-
islator only openly and directly, he would sometimes
be afraid to oppose him; and at other times party spir-
it might encourage him to brave it at every turn. . . .
But the American judge is brought into the political
arena independently of his own will.  He judges the
law only because he is obliged to judge a case.  The po-
litical question that he is called upon to resolve is
connected with the interests of the parties, and he
cannot refuse to decide it without a denial of justice."
A. de Tocqueville, Democracy in America 102-03 (P.
Bradley ed. 1948).

That doctrine of standing, that jurisdictional limitation
upon our powers, does not have as its purpose (as the
majority assumes) merely to assure that we will decide
disputes in concrete factual contexts that enable "realistic
appreciation of the consequences of judicial action," *ante,*
at 14.  To the contrary.  "[T]he law of Art. III standing is
built on a single basic idea—the idea of separation of
powers."  *Allen* v. *Wright*, 468 U. S. 737, 752 (1984).  It
keeps us minding our own business.

We consult history and judicial tradition to determine
whether a given "'disput[e is] appropriately resolved
through the judicial process.'"  *Lujan* v. *Defenders of Wild-
life*, 504 U. S. 555, 560 (1992) (internal quotation marks
omitted).  What history and judicial tradition show is that
courts do not resolve direct disputes between two political
branches of the same government regarding their respec-
tive powers.  Nearly every separation-of-powers case
presents questions like the ones in this case.  But we have
*never* passed on a separation-of-powers question raised

directly by a governmental subunit's complaint. We have *always* resolved those questions in the context of a private lawsuit in which the claim or defense depends on the constitutional validity of action by one of the governmental subunits that has caused a private party concrete harm. That is why, for example, it took this Court over 50 years to rule upon the constitutionality of the Tenure of Office Act, passed in 1867. If the law of standing had been otherwise, "presumably President Wilson, or Presidents Grant and Cleveland before him, would . . . have had standing, and could have challenged the law preventing the removal of a Presidential appointee without the consent of Congress." *Raines* v. *Byrd*, 521 U. S. 811, 828 (1997).

We do not have to look far back in the United States Reports to find other separation-of-powers cases which, if the Arizona Legislature's theory of standing is correct, took an awfully circuitous route to get here. In *Zivotofsky* v. *Kerry*, *ante,* p. \_\_\_, the President could have sued for an injunction against Congress's attempted "direct usurpation" of his constitutionally-conferred authority to pronounce on foreign relations. Or in *Wellness Int'l Network, Ltd.* v. *Sharif*, 575 U. S. \_\_\_ (2015), a Federal District Judge could have sought a declaratory judgment that a bankruptcy court's adjudicating a *Stern* claim improperly usurped his constitutionally conferred authority to decide cases and controversies. Or in *NLRB* v. *Noel Canning*, 573 U. S. \_\_\_ (2014), the Senate could have sued the President, claiming a direct usurpation of its prerogative to advise on and consent to Presidential appointments. Each of these cases involved the allocation of power to one or more branches of a government; and we surely would have dismissed suits arising in the hypothesized fashions.

We have affirmatively rejected arguments for jurisdiction in cases like this one. For example, in *Raines*, 521 U. S., at 829–830, we refused to allow Members of Con-

gress to challenge the Line Item Veto Act, which they claimed "'unconstitutionally expand[ed] the President's power'" and "'alter[ed] the constitutional balance of powers between the Legislative and Executive Branches.'" *Id.*, at 816. In *Massachusetts* v. *Mellon*, 262 U. S. 447, 479–480 (1923), we refused to allow a State to pursue its claim that a conditional congressional appropriation "constitute[d] an effective means of inducing the States to yield a portion of their sovereign rights." (And *Mellon* involved a contention that *one* government infringed upon *another* government's power—far closer to the traditional party-versus-party lawsuit than is an intragovernmental dispute.) We put it plainly: "In the last analysis, the complaint of the plaintiff State is brought to the naked contention that Congress has usurped the reserved powers of the several States," *id.,* at 483—and because the State could not show a discrete harm except the alleged usurpation of its powers, we refused to allow the State's appeal.

The sole precedent the Court relies upon is *Coleman* v. *Miller*, 307 U. S. 433 (1939). *Coleman* can be distinguished from the present case as readily as it was distinguished in *Raines*. In *Raines*, the accurate-in-fact (but inconsequential-in-principle) distinction was that the Senators in *Coleman* had their votes nullified, whereas the Members of Congress claimed that their votes could merely be rendered ineffective by a Presidential line-item veto. *Raines*, *supra*, at 823–824. In the present case we could make the accurate-in-fact distinction that in *Coleman* individual legislators were found to have standing, whereas here it is the governmental body, the Arizona Legislature, that seeks to bring suit. But the reality is that the supposed holding of *Coleman* stands out like a sore thumb from the rest of our jurisprudence, which denies standing for intragovernmental disputes.

*Coleman* was a peculiar case that may well stand for nothing. The opinion discussing and finding standing, and

going on to affirm the Kansas Supreme Court, was written by Chief Justice Hughes and announced by Justice Stone. Justice Frankfurter, joined by three other Justices, held there was no standing, and would have dismissed the petition (leaving the judgment of the Kansas Supreme Court in place). Justice Butler, joined by Justice McReynolds, dissented (neither joining Hughes's opinion nor separately discussing standing) and would have reversed the Kansas Supreme Court.

That adds up to two votes to affirm on the merits, two to reverse on the merits (without discussing standing) and four to dismiss for lack of standing. Justice Stanley Reed, who was on the Court and apparently participated in the case, is not mentioned in any of the opinions recorded in the United States Reports. So, in order to find *Coleman* a binding precedent on standing, rather than a 4-to-4 standoff, one must assume that Justice Reed voted with Hughes. There is some reason to make that assumption: The four Justices rejecting standing went on to discuss the merits, because "the ruling of the Court just announced removes from the case the question of petitioners' standing to sue." 307 U. S., at 456 (Black, J., concurring). But then again, if nine Justices participated, how could it be that on one of the two issues in the case the Court was "equally divided and therefore . . . expresse[d] no opinion"? *Id.*, at 447.

A pretty shaky foundation for a significant precedential ruling. Besides that, the two dissenters' mere assumption of standing—neither saying anything about the subject nor joining Hughes's opinion on the point—produces (if you assume Reed joined Hughes) a majority for standing but no majority opinion explaining why. And even under the most generous assumptions, since the Court's judgment on the issue it resolved rested on the ground that that issue presented a political question—which is itself a rejection of jurisdiction, *Zivotofsky* v. *Clinton*, 566 U. S.

___ (2012) (slip op., at 5)—*Coleman*'s discussion of the additional jurisdictional issue of standing was quite super-fluous and arguably nothing but dictum. The peculiar decision in *Coleman* should be charitably ignored.

The Court asserts, quoting *Raines*, 521 U. S., at 819–820, that the Court's standing analysis has been "especially rigorous when reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Ante,* at 14, n. 12. The cases cited to support this dictum fail to do so; they are merely cases where a determination of unconstitutionality is avoided by applying what there is no reason to believe is anything other than *normal* standing requirements. It seems to me utterly implausible that the Framers wanted federal courts limited to traditional judicial cases only when they were pronouncing upon the rights of Congress and the President, and not when they were treading upon the powers of state legislatures and executives. Quite to the contrary, I think they would be *all the more averse* to unprecedented judicial meddling by federal courts with the branches of their state governments.

I would dismiss this case for want of jurisdiction.

\*   \*   \*

Normally, having arrived at that conclusion, I would express no opinion on the merits unless my vote was necessary to enable the Court to produce a judgment. In the present case, however, the majority's resolution of the merits question ("legislature" means "the people") is so outrageously wrong, so utterly devoid of textual or historic support, so flatly in contradiction of prior Supreme Court cases, so obviously the willful product of hostility to dis-tricting by state legislatures, that I cannot avoid adding my vote to the devastating dissent of the Chief Justice.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1314

_____

## ARIZONA STATE LEGISLATURE, APPELLANT *v.* ARIZONA INDEPENDENT REDISTRICTING COMMISSION ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

[June 29, 2015]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, dissenting.

Reading today's opinion, one would think the Court is a great defender of direct democracy in the States. As it reads "the Legislature" out of the Times, Places and Manner Clause, U. S. Const., Art. I, §4, the majority offers a paean to the ballot initiative. It speaks in glowing terms of the "characteristic of our federal system that States retain autonomy to establish their own governmental processes." *Ante,* at 27. And it urges "[d]eference to state lawmaking" so that States may perform their vital function as "'laboratories'"of democracy. *Ante,* at 28.

These sentiments are difficult to accept. The conduct of the Court in so many other cases reveals a different attitude toward the States in general and ballot initiatives in particular. Just last week, in the antithesis of deference to state lawmaking through direct democracy, the Court cast aside state laws across the country—many of which were enacted through ballot initiative—that reflected the traditional definition of marriage. See *Obergefell* v. *Hodges*, *ante,* p. \_\_\_.

This Court's tradition of disdain for state ballot initiatives goes back quite a while. Two decades ago, it held unconstitutional an Arkansas ballot initiative imposing

term limits on that State's Members of Congress, finding
"little significance" in the fact that such term limits were
adopted by popular referendum. *U. S. Term Limits, Inc.* v.
*Thornton*, 514 U. S. 779, 822, n. 32 (1995).  One year later,
it held unconstitutional a ballot initiative that would have
prevented the enactment of laws under which "'homosex-
ual, lesbian or bisexual orientation, conduct, practices or
relationships [would] constitute or otherwise be the basis
of . . . any minority status, quota preferences, protected
status or claim of discrimination.'" *Romer* v. *Evans*, 517
U. S. 620, 624 (1996).  The Court neither gave deference to
state lawmaking nor said anything about the virtues of
direct democracy.  It instead declared that the result of the
ballot initiative was an aberration—that "[i]t is not within
our constitutional tradition to enact laws of this sort." *Id.,*
at 633.  But if "constitutional tradition" is the measuring
stick, then it is hard to understand how the Court con-
dones a redistricting practice that was unheard of for
nearly 200 years after the ratification of the Constitution
and that conflicts with the express constitutional com-
mand that election laws "be prescribed in each State by
the Legislature thereof," Art. I, §4.

The Court's lack of respect for ballot initiatives is evi-
dent not only in what it has done, but in what it has failed
to do.  Just this Term, the Court repeatedly refused to
review cases in which the Courts of Appeals had set aside
state laws passed through ballot initiative.  See, *e.g.,*
*County of Maricopa* v. *Lopez-Valenzuela*, 575 U. S. ___
(2015) (THOMAS, J., dissenting from denial of certiorari)
(state constitutional amendment denying bail for illegal
aliens arrested in certain circumstances); *Herbert* v. *Kitchen*,
574 U. S. ___ (2014) (state constitutional amendment
retaining traditional definition of marriage); *Smith* v.
*Bishop*, 574 U. S. ___ (2014) (same); *Rainey* v. *Bostic*, 574
U. S. ___ (2014) (same); *Walker* v. *Wolf*, 574 U. S. ___
(2014) (same).  It did so despite warnings that its indiffer-

ence to such cases would "only embolden the lower courts to reject state laws on questionable constitutional grounds." *Lopez-Valenzuela, supra,* at ___ (slip op., at 2). And it refused to grant a stay pending appeal of a decision purporting to require the State of Alabama to issue marriage licenses to same-sex couples, even though Alabama's licensing laws had not been challenged in that case. See *Strange* v. *Searcy*, 574 U. S. ___ (2015) (THOMAS, J., dissenting from denial of application for stay). In each decision, the cheers for direct democracy were conspicuously absent.

Sometimes disapproval of ballot initiatives has been even more blatant. Just last Term, one dissenting opinion castigated the product of a state ballot initiative as "stymieing the right of racial minorities to participate in the political process." *Schuette* v. *BAMN*, 572 U. S. ___, ___ (2014) (SOTOMAYOR, J., joined by GINSBURG, J., dissenting) (slip op., at 1). It did not hail the ballot initiative as the result of a "State's empowerment of its people," *ante,* at 19, nor offer any deference to state lawmaking. Instead, it complained that "[t]he majority of Michigan voters changed the rules in the middle of the game, reconfiguring the existing political process . . . ." *Schuette*, 572 U. S., at ___ (slip op., at 4). And it criticized state ballot initiatives as biased against racial minorities because such minorities "face an especially uphill battle" in seeking the passage of such initiatives. *Id.*, at ___ (slip op., at 20). How quickly the tune has changed.

And how striking that it changed here. The ballot initiative in this case, unlike those that the Court has previously treated so dismissively, was unusually democracy-reducing. It did not ask the people to approve a particular redistricting plan through direct democracy, but instead to take districting away from the people's representatives and give it to an unelected committee, thereby reducing democratic control over the process in the future. The

Court's characterization of this as direct democracy at its best is rather like praising a plebiscite in a "banana republic" that installs a strongman as President for Life. And wrapping the analysis in a cloak of federalism does little to conceal the flaws in the Court's reasoning.

I would dispense with the faux federalism and would instead treat the States in an evenhanded manner. That means applying the Constitution as written. Although the straightforward text of Article I, §4, prohibits redistricting by an unelected, independent commission, Article III limits our power to deciding cases or controversies. Because I agree with JUSTICE SCALIA that the Arizona Legislature lacks Article III standing to assert an institutional injury against another entity of state government, I would dismiss its suit. I respectfully dissent.